# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Samuel Zean and Eunice Zean,<br><br>               Plaintiffs,<br><br>v.<br><br>Wells Fargo Bank, N.A.; Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union, LLC,<br><br>               Defendants. | Case No. 17-cv-3817 (JNE/HB)<br><br><br><br>**ORDER** |

HILDY BOWBEER, United States Magistrate Judge

This matter is before the Court on Plaintiffs' Motion to Amend the Amended Complaint [Doc. No. 43].  As set forth fully below, the motion is granted in part and denied in part.

## I.    Background

Plaintiffs Samuel and Eunice Zean commenced this action by serving a state court complaint on Defendants Wells Fargo Bank, N.A.; Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.  (*See* Notice of Removal [Doc. No. 1]; Compl. [Doc. No. 1-1].)  Wells Fargo removed the action to federal court on August 18, 2017.  Plaintiffs filed an amended complaint as a matter of course pursuant to Federal Rule of Civil Procedure 15(a)(1) on September 15, 2017.  (Am. Compl. [Doc. No. 18].)  The amended complaint asserts eighteen claims for relief, all related to a dispute over $4,528 in mortgage-related payments.  (Am. Compl. ¶¶ 1, 120-273.)

### A.      Allegations and Claims in the Amended Complaint

Plaintiffs purchased their home in Brooklyn Park, Minnesota, in January 2015. (Am. Compl. ¶ 9.)  They obtained a thirty-year fixed rate mortgage loan from Wells Fargo and timely made their mortgage payments for the first year.  (Am. Compl. ¶¶ 1, 13-14.)

In January 2016, Plaintiffs received from Wells Fargo an "Escrow Account Disclosure Statement and Notice of New Mortgage Payment," which required them "to pay a predicted escrow deficiency of $502.35" or incur an increased monthly mortgage payment.  (Am. Compl. ¶¶ 15-16.)  Three months later, they received another Escrow Account Disclosure Statement and Notice of New Mortgage Payment requiring them to pay an additional $456.46 or face an increased monthly payment.  (Am. Compl. ¶¶ 18-19.)  After conferring with Wells Fargo about their concern with a fluctuating mortgage payment, Plaintiffs and Wells Fargo agreed that Plaintiffs would pay $1,136.70 a month to ensure their payment would remain at or below $1,433.95 until March 2017.  (Am. Compl. ¶¶ 20-22.) According to Plaintiffs, this was a "verbal agreement and contract" under which Plaintiffs "would pay the alleged escrow shortage amount of $456.46 and would also 'buydown' their escrow account in the amount of $680.24."  (Am. Compl. ¶ 23.)  As Plaintiffs explain it, "[a]n escrow 'buydown' is a process common in the mortgage industry whereby a consumer chooses to pay an escrow sum in cash versus financing his or her escrow contributions by making monthly escrow contributions." (Am. Compl. ¶ 24.)  The parties agreed that Wells Fargo would hold the $680.24 interest-free and would allocate 1/12 of the amount to Plaintiffs' escrow account each month until

March 2017.  (Am. Compl. ¶ 25.)  Pursuant to the agreement, Plaintiffs paid $1,136.70 on March 31, 2016, and from March to August 2016, they paid $1,433.95 monthly.  (Am. Compl. ¶¶ 27-28.)

Without notification, Plaintiffs allege, Wells Fargo unilaterally increased the monthly mortgage payment amount and withdrew $1,496.85 from their U.S. Bank checking account in July 2016, which caused an overdraft and fee assessment.  (Am. Compl. ¶¶ 29-32.)  In September 2016, Wells Fargo issued another disclosure statement and notice of new mortgage payment, along with a check in the amount of $330.05 to repay a supposed escrow overage.  (Am. Compl. ¶¶ 33-35.)  At the same time, Wells Fargo raised the monthly mortgage payment from $1,433.95 to $1,496.85 to cover a predicted escrow shortfall.  (Am. Compl. ¶ 36.)  Plaintiffs believe Wells Fargo purposely manufactured a deficiency to raise their monthly mortgage payment.  (Am. Compl. ¶ 38.)

Plaintiffs protested the change to Wells Fargo, which told Plaintiffs that the "Real Estate Settlement Procedures Act (RESPA) Guidelines do not prohibit multiple analyses to the costumer's loan. It is not illegal for Wells Fargo to analyze the loan periodically." (Am. Compl. ¶ 40.)  Wells Fargo further explained that the amount needed for escrow had increased due to increased taxes, to which Plaintiffs responded that their taxes were the same as the previous year.  (Am. Compl. ¶¶ 43-44.)  Wells Fargo then said the reason for the increase was an increased insurance premium, but the insurer denied communicating that to Wells Fargo.  (Am. Compl. ¶¶ 45-46.)  Plaintiffs disputed the increased monthly mortgage payment and refused the $330.05 check.  (Am. Compl. ¶¶ 48-49.)  Nonetheless, Wells Fargo withdrew $1,496.85 again in October 2016, causing

an overdraft and fee assessment.  (Am. Compl. ¶¶ 53-54.)  Plaintiffs wrote Wells Fargo a

letter on October 3, 2016, demanding that Wells Fargo cease the automatic monthly debit

of $1,496.85 and authorizing a monthly debit of $1,433.95.  (Am. Compl. ¶ 56.)  Despite

Wells Fargo's assurances, it did not change the monthly debited amount, and the

automatic withdrawals caused overdrafts for which Plaintiffs were charged a fee.

In November 2016, Wells Fargo sent Plaintiffs a letter explaining that they had

paid $680.24 as an escrow buydown, which was intended to reduce their monthly

payment to $1,433.95 until March 2017.  (Am. Compl. ¶ 60.)  Wells Fargo explained that

its policy was to review escrow accounts annually, and Plaintiffs' account was reviewed

in January 2016, one year after their loan originated.  (Am. Compl. ¶ 61.)  Wells Fargo

claimed it had mailed Plaintiffs a letter in July 2016 notifying them of the adjustment to

the monthly withdrawal amount.  (Am. Compl. ¶ 58.)  Plaintiffs deny receiving the letter.

(Am. Compl. ¶ 62.)

Plaintiffs ceased the autopay function for the mortgage payments in December

2016 and made a payment of $1,433.95 through other means.  (Am. Compl. ¶¶ 66-67.)

Wells Fargo refused to credit Plaintiffs with the payment, however, until it received an

additional $62.90.  (Am. Compl. ¶¶ 68-69.)  Wells Fargo then "began an aggressive

campaign of debt collection calls."  (Am. Compl. ¶ 70.)

On December 23, 2016, Plaintiffs made a mortgage payment of $1,433.95 to cover

the January 2017 payment.  (Am. Compl. ¶¶ 71-72.)  Despite Wells Fargo's assurance

that the payment would be applied to the January obligation, Wells Fargo allocated

$62.90 of the payment to the December mortgage payment and the remainder to the

principal of the loan.  (Am. Compl. ¶¶ 73-74.)  Wells Fargo also credited to the escrow

account the $330.05 that it had previously attempted to return to Plaintiffs.  (Am. Compl.

¶ 77.)  Wells Fargo recorded that Plaintiffs failed to make the January payment and

recorded another shortfall in February 2017 when Plaintiffs again paid $1,433.95.  (Am.

Compl. ¶¶ 76, 78, 80.)

On February 18, 2017, Plaintiffs received a mortgage statement indicating a past

due balance of $2,993.70.  (Am. Compl. ¶ 81.)  Plaintiff Samuel Zean experienced a

panic attack as a result, and required medical treatment and medication.  (Am. Compl.

¶ 86.)  He requires ongoing treatment for "extreme anxiety, sleeplessness, headaches, and

stress" caused by the fear he will lose his home.  (Am. Compl. ¶¶ 87, 113.)

Wells Fargo refused to explain how it calculated the amount due and demanded

that Plaintiffs pay $4,528.00.  (Am. Compl. ¶¶ 92-94.)  Inconsistent with Wells Fargo's

ongoing demands for payment and the billing statements sent to Plaintiffs, it represented

to several credit reporting agencies that Plaintiffs owed no past due amount.  (Am.

Compl. ¶¶ 101-04.)  Wells Fargo has sent individuals to Plaintiffs' home several times to

examine the property and to post pre-foreclosure notices.  (Am. Compl. ¶¶ 117-18.)

Based on the above events, Plaintiffs brought eighteen claims for relief in their

amended complaint: (1) a claim for declaratory relief against Wells Fargo pursuant to

Minn. Stat. § 555.01; (2) a negligence claim against Wells Fargo; (3) an unjust

enrichment claim against Wells Fargo; (4) a fraud claim against Wells Fargo; (5) a breach

of contract claim against Wells Fargo; (6) a claim for violation of the Electronic Funds

Transfer Act (EFTA), 15 U.S.C. § 1693, against Wells Fargo; (7) a claim for violation of

the Minnesota Consumer Fraud Act (CFA), Minn. Stat. § 325.68, against Wells Fargo;

(8) a claim for violation of the Minnesota Homeowners Bill of Rights Act, Minn. Stat.

§ 582.043, against Wells Fargo; (9) a claim for negligent violations of the Telephone

Consumer Protection Act (TCPA), 47 U.S.C. § 227, against Wells Fargo; (10) knowing

and/or willful violations of the TCPA, 47 U.S.C. § 227, against Wells Fargo;

(11) negligent violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681,

against all Defendants; (12) knowing and/or willful violations of the FCRA, 15 U.S.C.

§ 1681, against all Defendants; (13) intentional infliction of emotional distress against

Wells Fargo; (14) invasion of privacy-intrusion upon seclusion against Wells Fargo;

(15) invasion of privacy-publication of private facts against Wells Fargo; (16) violation

of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2609, against Wells

Fargo; (17) defamation against Wells Fargo; and (18) compelled self-publication

defamation against Wells Fargo.  (Am. Compl. ¶¶ 119-273.)

### B.    Wells Fargo's Motion to Dismiss

On October 10, 2017, Wells Fargo moved to dismiss Counts 2, 3, 4, 5, 7, 8, 15,

and 16 of the amended complaint.  The District Court held a hearing on the motion on

December 7, 2017, and the motion remains under advisement.

### C.    Plaintiffs' Motion to Amend

Approximately two weeks after the hearing on the motion to dismiss, Plaintiffs

filed a motion to amend, seeking to "clarify" numerous claims and allegations and to

assert a new claim under § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.

(Pls.' Mem. Supp. Mot. Amend at 1 [Doc. No. 44].)  The proposed second amended

complaint contains more than 100 stylistic and substantive revisions.  (*See* Proposed Second Am. Compl. [Doc. No. 45-1].)  Plaintiffs do not discuss each proposed amendment in their supporting memorandum, but categorize the proposed amendments as follows: (1) allegations concerning the circumstances leading up to and surrounding the "escrow buydown" agreement; (2) allegations concerning qualified written requests (QWR) Plaintiffs sent to Wells Fargo; (3) allegations concerning the "negligent financial advice" Wells Fargo gave to Plaintiffs concerning a financial product; (4) an allegation that Wells Fargo unjustly enriched itself by investing the funds it seized from Plaintiffs' checking account and earning interest on those funds; (5) allegations concerning the fraud claim; (6) allegations concerning the breach of contract claim; (7) a nineteenth claim for relief for violation of § 10b-5 of the Securities Exchange Act; and (8) various formatting and stylistic amendments.

Wells Fargo opposes the motion on the basis of futility.  No other Defendant filed a response to the motion.

## II.    Legal Standard

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave," and "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2). "[T]here is no absolute right to amend," however, and a court may deny leave to amend "based upon a finding of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies in previous amendments, undue prejudice to the non-moving party, or futility."  *Baptist Health v. Smith*, 477 F.3d 540, 544 (8th Cir. 2007) (citation omitted).

When a party challenges a proposed amendment on futility grounds, the Court considers whether the amendment could withstand a Rule 12(b)(6) motion to dismiss. *See Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008). Dismissal is warranted under Rule 12(b)(6) when a party fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [party] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* The party must plead facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Labels, bare conclusions, and formulaic recitations of the elements are not enough. *Id.* In applying the Rule 12(b)(6) standard, a court accepts all alleged facts as true and affords the pleader all reasonable inferences arising from the allegations. *Butler v. Bank of Am., N.A.*, 690 F.3d 959, 961 (8th Cir. 2012).

Generally, a court may not consider matters outside the pleadings in assessing the sufficiency of a complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citations omitted). But a court may make an exception to this rule for matters of public record, exhibits attached to the pleading, and other materials "necessarily embraced by the pleadings." *Id.* (citations omitted).

### III.   Discussion

##### A.   New Allegations Concerning the "Escrow Buydown" Agreement and New Claim for Violation of § 10(b) and Rule 10b-5 of the Securities Exchange Act

Plaintiffs seek leave to allege that their "purchase" of an "escrow buydown" for the purpose of maintaining a consistent monthly payment was an "investment contract" and thus a "security" covered by the Securities Exchange Act.  (Proposed Second Am. Compl. ¶¶ 31, 34, 306.)  Plaintiffs contend that the escrow buydown was a standalone financial product sold to them by Wells Fargo, and that they purchased the product based solely on Wells Fargo's financial advice.  (Pls.' Reply Mem. at 2 [Doc. No. 55].) Plaintiffs allege that Wells Fargo violated § 10(b) and Rule 10b-5 of the Securities Exchange Act by making false statements about the value of the buydown agreement, the stability of the investment, and the suitability of the investment for their needs. (Proposed Second Am. Compl. ¶¶ 301, 307.)  Plaintiffs allege they reasonably expected to profit from the product.  (Proposed Second Am. Compl. ¶ 305.)

Wells Fargo argues that an escrow buydown is not a "security," as that term is defined by the Securities Exchange Act or otherwise.  Plaintiffs concede that the term "escrow buydown" or similar terms are not included in the definition of "security" under the Act, *see* 15 U.S.C. § 78c(a)(10), but they urge the Court to "examine the substance— the economic realities of the transaction" and conclude the escrow buydown was, in essence, a "security."  (Pls.' Reply Mem. at 4 (quoting *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851 (1975).)

Plaintiffs first liken the escrow buydown to an "investment contract," which is

included in the definition of security provided in 15 U.S.C. § 78c(a)(10), and was

determined to be a "security" in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

Indeed, Plaintiffs expressly describe the escrow buydown as an "investment contract" in

their proposed second amended complaint.  (Proposed Second Am. Compl. ¶ 306.)

But the escrow buydown alleged here does not fit within *W.J. Howey*'s definition

of "investment contract."  The Supreme Court defined "investment contract" under the

Securities Exchange Act to mean "a contract, transaction or scheme whereby a person

invests his money in a common enterprise and is led to expect profits solely from the

efforts of the promoter or a third party . . . ." *W.J. Howey*, 328 U.S. at 299.  The escrow

buydown agreement alleged here, however, was entered into by the parties to alleviate

Plaintiffs' concern about a fluctuating mortgage payment and ensure that their mortgage

payment would remain at or below $1,433.95 until March of 2017.  Moreover, the parties

agreed that Wells Fargo would hold the contributions "interest free" and would "allocate

one twelfth of the buydown amount to the Zean escrow account each month until March

2017."  (Am. Compl. ¶ 25; Proposed Second Am. Compl. ¶ 37.)  Plaintiffs have not

alleged any facts that would support a reasonable inference that the escrow buydown was

an investment, that they were led to expect profits, or that they in fact expected to profit

from the efforts of Wells Fargo.  Though Plaintiffs propose to allege they "reasonably

expected to profit from the Escrow Buydown agreement" (Proposed Second Am. Compl.

¶ 305), this conclusory allegation is flatly contradicted by the allegation that Wells Fargo

would hold the funds interest free.  No substantive factual allegations support an

expectation of profit.  Rather, the only reasonable inferences to be drawn from the

relevant allegations in the proposed second amended complaint are that Plaintiffs deposited funds with Wells Fargo for the purpose of paying their property taxes and insurance premiums, and Plaintiffs knew they would not recover those funds or earn any additional money from those funds.

Alternatively, Plaintiffs submit in their supporting memorandum that the "economic reality" of the escrow buydown "is virtually identical in economic form to a variable rate annuity," because they "paid a set price with the expectation that the financial product would cover any increases or variations in their escrow payment for a fixed period of time." (Pls.' Mem. Supp. Mot. Amend at 4.) The comparison of the escrow buydown to a variable rate annuity is flawed, however. First, Plaintiffs do not allege in their proposed second amended complaint that they expected the escrow buydown would cover any increases or variations in their escrow payment. Second, even if they had, the escrow buydown does not fit within the definition of "annuity" provided by Plaintiffs: "An annuity is a contractual financial product sold by financial institutions that is designed to accept *and grow* funds from an individual and then, upon annuitization, pay out a stream of payments to the individual at a later point in time." (Pls.' Reply Mem. at 4 n.3 [Doc. No. 55]) (emphasis added). The escrow buydown account was not intended to grow the funds deposited in it. To the contrary, the proposed second amended complaint avers that Wells Fargo held the funds "interest free." Consequently, the Court concludes that the escrow buydown is not an annuity, and thus not a "security."

Accordingly, Plaintiffs' proposed new claim under § 10(b) and Rule 10b-5 of the

Securities Exchange Act is futile, and Plaintiffs' request to add this claim is denied.

Plaintiffs have articulated no independent grounds for adding the related factual

allegations to the amended complaint, and Plaintiffs' request to make those amendments

is therefore also denied.

### B.     QWRs and the RESPA Claim

Plaintiffs allege in the amended complaint that Wells Fargo violated RESPA, 12

U.S.C. § 2609.  Plaintiffs now seek to change the reference to § 2609 to § 2601 on the

ground that the original reference was a drafting error, and to clarify that Wells Fargo

failed to respond to a QWR in violation of § 2605(e).  Wells Fargo contends the

amendments do not save Plaintiffs' RESPA claim because Plaintiffs have not alleged

actual damages caused by a failure to respond to a QWR.

"RESPA limits an individual's damages for violations of QWR requirements to

'actual damages.'"  *Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 510 (8th Cir.

2012).  The damages must flow from the failure to respond to the QWR.  *See Doran v.

Selene Finance, LP*, No. 12-cv-886 (SRN/FLN), 2013 WL 53840, at *6 (D. Minn. Jan. 3,

2013).  To survive a motion to dismiss, a plaintiff must allege actual damages that were

caused by the RESPA violation.  *Id.*

Plaintiffs claim they have suffered actual damages in the form of Mr. Zean's

"extreme anxiety, sleeplessness, headaches, and stress related to the possibility of Mr.

and Mrs. Zean losing their family home."  (Proposed Second Am. Compl. ¶ 102.)

Putting aside the question of whether stress or a medical condition qualifies as actual

damages under RESPA,[1] the Court finds that Plaintiffs have failed to allege a causal

connection between Mr. Zean's medical condition and Wells Fargo's alleged failure to

respond to the QWR.  Rather, the proposed second amended complaint alleges that Mr.

Zean's stress and other conditions were caused by "Wells Fargo's tortious behavior and

patent refusal to correct its billing errors," computer-dialed phone calls, trespassing,

posting a pre-foreclosure notice, and sending threatening statements and letters.

(Proposed Second Am. Compl. ¶¶ 130, 233-35.)  Notably, the RESPA count does not

mention actual damages or Mr. Zean's alleged medical condition at all, much less allege

causation.  (Proposed Second Am. Compl. ¶¶ 276-81.)  The Court concludes that

amendment of the RESPA claim would be futile, and Plaintiffs' request to amend it is

denied.

### C.      Negligence Claim

Plaintiffs alleged in the amended complaint that Wells Fargo had a duty to

accurately bill its customers, service Plaintiffs' mortgage, keep reasonable records,

investigate customer disputes, and report amounts due.  (Am. Compl. ¶¶ 123-24.)  Wells

Fargo moved to dismiss on the basis that it owed no fiduciary duty of care to Plaintiffs

based on their relationship as mortgagor and mortgagee.  This is generally true.  *See*

*Roers v. Countrywide Home Loans, Inc.*, 728 F.3d 832, 837-38 (8th Cir. 2013).  After

reviewing Wells Fargo's motion to dismiss, Plaintiffs sought leave to amend the

negligence claim to allege that Wells Fargo was acting as an investment advisor when it

---

[1] Courts are divided about whether "actual damages" means only pecuniary damages or
may also include emotional distress damages.  *See Silberstein v. Fed. Nat'l Mortg. Ass'n*,
No. 5:16-cv-5331, 2017 WL 187165, at *3 n.4 (W.D. Ark. Jan. 17, 2017) (citing cases).

recommended the escrow buydown and that Wells Fargo owed Plaintiffs fiduciary duties of care and loyalty.  (Proposed Second Am. Compl. ¶¶ 140-41.)  Plaintiffs assert that Wells Fargo breached its fiduciary duties "by recommending a financial product with no guarantee the product would meet the needs of the Zeans."  (Proposed Second Am. Compl. ¶ 145.)

Wells Fargo opposes the amendments as futile.  Wells Fargo first attacks Plaintiffs' reliance on the principle that  "[i]nvestment advisors owe their clients a fiduciary duty of care."  (Proposed Second Am. Compl. ¶ 140 (citing *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963).)  Wells Fargo points out that the Investment Advisors Act of 1940, 15 U.S.C. § 80b-1 *et seq.*, which was the subject of the *Capital Gains* decision, specifically excludes a bank from the definition of "investment advisor."  *See* 15 U.S.C. § 80b-2(a)(11).  The definition of "investment advisor" also requires that the advice relate to the investment in, purchase of, or sale of a "security." *Id.*  Wells Fargo submits that the escrow buydown was not an "investment" for the same reasons it was not a "security."  Plaintiffs do not respond directly to these arguments, but make the following two points: (1) the escrow buydown was a distinct financial product from the mortgage; and (2) the negligence claim is not barred by Minn. Stat. § 513.33, the Minnesota Credit Agreement Statute of Frauds.  (Pls.' Reply Mem. at 5-6.)

Plaintiffs do not dispute that Wells Fargo, as a lender, owed no fiduciary duties to Plaintiffs, as borrowers.  *See Roers v. Countrywide Home Loans, Inc.*, 728 F.3d 832, 837-38 (8th Cir. 2013).  Plaintiffs do not allege facts that would support a plausible inference that Wells Fargo, which is irrefutably a bank, is also an "investment advisor."  The

definition of "investment advisor" under § 80b-2(a)(11) requires that the advice pertain to a "security," and this Court has determined that the escrow buydown was not a "security."  Plaintiffs' arguments that the escrow buydown was a distinct financial product and that the negligence claim is not barred by Minn. Stat. § 513.33 do not affect this determination.  Consequently, the Court concludes that Plaintiffs' amended negligence claim does not state a plausible claim for negligent investment advice, and leave to amend is denied.

### D.      Unjust Enrichment Claim

Plaintiffs originally pleaded that Wells Fargo was unjustly enriched by taking money from their account without proper authority.  (Am. Compl. ¶¶ 136-37.)  Wells Fargo moved to dismiss on the grounds that (1) unjust enrichment does not apply when there is an applicable enforceable contract such as a mortgage, and (2) Wells Fargo was not actually enriched.

Plaintiffs now seek to amend the complaint to allege that Wells Fargo "invested the funds thereby earning interest and further enriching itself."  (Proposed Second Am. Compl. ¶ 152.)  Wells Fargo did not address this proposed amendment to the unjust enrichment claim in its memorandum in opposition.  At the hearing on the motion to amend, however, Wells Fargo characterized the amendment as conclusory and inconsistent with other allegations.  The Court agrees with Wells Fargo.

The equitable doctrine of unjust enrichment "allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012).  The

doctrine "does not apply when there is an enforceable contract that is applicable." *Id.*

Plaintiffs do not allege that the mortgage contract and the escrow buydown agreement are

not enforceable.  Nor have Plaintiffs alleged facts that would create a plausible inference

that Wells Fargo was actually "enriched," that is, retained any of the escrowed money for

itself.  In fact, Plaintiffs allege that Wells Fargo tried to refund them money when their

escrow account balance grew too much.  And Plaintiffs' proposed assertion that Wells

Fargo invested and earned interest on the money deposited in the escrow account is mere

speculation that is inconsistent with other allegations concerning the escrow buydown.

Accordingly, Plaintiffs cannot assert an unjust enrichment claim as a matter of law, and

the Court therefore denies leave to amend the unjust enrichment claim.

### E.      Fraud Claim

In the amended complaint, Plaintiffs alleged that Wells Fargo made three

fraudulent representations: (1) "Defendant offered Plaintiffs a consistent mortgage

payment until March of 2017 in exchange for a one-time payment"; (2) "In September of

2016, Defendant committed a second fraud stating that it would not make a second

automated withdrawal of the amount of $1,496.85"; and (3) "In October of 2016,

Defendant committed a third fraud stating that it would not make a second automated

withdrawal of the amount of $1,496.85."  (Am. Compl. ¶¶ 139, 145, 149.)  Plaintiffs

alleged other details surrounding the making of the statements, as well.  Wells Fargo

moved to dismiss, arguing lack of particularity as to when, where, how, and by whom the

statements were made.

Plaintiffs now seek to add numerous allegations describing the fraudulent

statements.  Wells Fargo argues the proposed amendments are futile because the

statements were representations about future acts, not past or existing facts, citing

*Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).  *Valspar*

set forth the elements necessary for a fraudulent representation claim:

> (1) a false representation . . . of a past or existing material fact susceptible
> of knowledge; (2) made with knowledge of the falsity of the representation
> or made without knowing whether it was true or false; (3) with the intention
> to induce [another] to act in reliance thereon; (4) that the representation
> caused [another] to act in reliance thereon; and (5) that [another] suffered
> pecuniary damages as a result of the reliance.

*Id.*  The *Valspar* court reiterated the "well-settled rule that a representation or expectation

as to future acts is not a sufficient basis to support an action for fraud merely because the

represented act or event did not take place."  *Id.* at 368-69.  But the court also

acknowledged "that a misrepresentation of a present intention could amount to fraud" if

"the promisor had no intention to perform at the time the promise was made."  *Id.* at 369.

Here, Plaintiffs specifically allege in the proposed second amended complaint that

Wells Fargo did not intend to honor two promises at the time the representations were

made: (1) the promise that Plaintiffs' mortgage payment amount would be consistent

until March of 2017 and (2) the promise in September 2016 not to make an automated

withdrawal of $1,496.85.  (Proposed Second Am. Compl. ¶¶ 157, 165.)  In light of these

allegations, the Court cannot conclude that the amendments to the first two alleged

fraudulent representations are futile, and leave to amend is granted.[2]  But Plaintiffs did

---

[2] In light of the fact that Wells Fargo's motion to dismiss remains pending before the
District Court, this Court did not consider any of the arguments made by Wells Fargo in
connection with that motion unless Wells Fargo also made those arguments in opposition

not allege a present intention, general or otherwise, with respect to the third alleged fraudulent representation (*see* Proposed Second Am. Compl. ¶¶ 168-72), and leave to amend that aspect of the claim is denied.

### F.      Breach of Contract Claim

Plaintiffs originally alleged that Wells Fargo committed a breach of contract by increasing their mortgage payment, manufacturing a reason to conduct an escrow review, and refusing to credit Plaintiffs for mortgage payments.  (Am. Compl. ¶¶ 155-57.)  Wells Fargo argued for dismissal on the basis that the escrow buydown agreement did not satisfy the Minnesota Credit Agreement Statute of Frauds, Minn. Stat. § 513.33.

To overcome this argument, Plaintiffs now propose to allege that the escrow buydown agreement was a valid verbal contract, and that Wells Fargo breached both that agreement and the written mortgage contract.  (Proposed Second Am. Compl. ¶¶ 174, 177.)  Wells Fargo allegedly breached the escrow buydown agreement "by unnecessarily increasing Plaintiffs' mortgage payment while failing to honor the guarantee Defendnat [sic] had sold Plaintiffs."  (Proposed Second Am. Compl. ¶ 176.)  Wells Fargo allegedly breached the mortgage contract by failing "to credit Plaintiff's [sic] account for mortgage contract payments" and "failing to properly allocate payments made on the account." (Proposed Second Am. Compl. ¶¶ 178-80.)  Plaintiffs also accuse Wells Fargo of breaching "the convent [sic] of good faith and fair dealing by using a manufactured

---

to Plaintiffs' motion to amend.  Wells Fargo's only argument raised in opposition to Plaintiffs' motion to amend their fraud claim was that a representation about a future event cannot form the basis for a fraud claim.  (*See* Def.'s Mem. Opp'n Mot. Amend at 19-22 [Doc. No. 53].)

homeowner hazard insurance amount to justify conducting an escrow review of

Plaintiffs' account resulting in an unnecessary increase in Plaintiffs' mortgage payment."

(Proposed Second Am. Compl. ¶ 181.)

Beginning with the proposed allegation that the escrow buydown agreement was a

valid verbal contract, Wells Fargo argues that the verbal agreement does not satisfy the

Minnesota Credit Agreement Statute of Frauds, Minn. Stat. § 513.33, and thus is not a

valid contract. The Minnesota Credit Agreement Statute of Frauds applies to "an

agreement to lend or forbear repayment of money, goods, or things in action, to otherwise

extend credit, or to make any other financial accommodation." Minn. Stat. § 513.33,

subd. 1(a). The term "financial accommodation" should be interpreted broadly. *Thomas

& Wong Gen. Contractor v. The Lake Bank, N.A.*, 553 F.3d 650, 652 (8th Cir. 2009).

A promise to postpone a foreclosure sale is a "financial accommodation" and thus

a "credit agreement" under the statute. *Bracewell v. U.S. Bank Nat'l Ass'n*, 748 F.3d 793,

795 (8th Cir. 2014). An agreement concerning a loan priority repayment plan is also a

"financial accommodation with respect to a lending agreement" and thus a "credit

agreement." *Rural Am. Bank of Greenwald v. Herickhoff*, 485 N.W.2d 702, 706 (Minn.

1992). On the other hand, an oral promise to refrain from recording a mortgage, standing

alone, is not a credit agreement. *Carlson v. Estes*, 458 N.W.2d 123, 127 (Minn. Ct. App.

1990). The oral promise in *Carlson* did "not concern the actual extension of credit or any

financial accommodation, but relate[d] to an action which may be taken if the condition

precedent is met." *Id.*

Informed by the *Bracewell*, *Herickhoff*, and *Carlson* decisions, the Court finds that

19

Wells Fargo's alleged promise to receive and hold funds for the payment of Plaintiffs' insurance premiums and property taxes and to pay one-twelfth of the amount to Plaintiffs' escrow account each month for twelve months was a financial accommodation related to a lending agreement and thus a credit agreement.  Specifically, the escrow buydown affected Plaintiffs' monthly payment to Wells Fargo, repaid Wells Fargo for an alleged shortage in the escrow account, and altered future amounts needed for escrow. The escrow buydown agreement was tied directly to and occasioned by a condition of the mortgage that required Plaintiffs to include in their monthly mortgage payment property taxes and insurance premiums.  (*See* Def.'s Mot. Dismiss App. Ex. A at 1 ¶ 2 [Doc. No. 34-1].)[3]  The terms of  the mortgage authorize Wells Fargo to collect and hold for escrow amounts for the payment of property taxes and insurance premiums.  (*Id.*)

Because the escrow buydown agreement is a "financial accommodation" under § 513.33, subdivision 1, the writing requirement of § 513.33, subdivision 2, applies. Consequently, Plaintiffs cannot enforce the alleged verbal escrow buydown agreement, and their request to amend the breach of contract claim, insofar as that claim is founded on the escrow buydown agreement, is futile.  The futility determination extends to the proposed allegation that Wells Fargo breached the covenant of good faith and fair dealing, because "an enforceable contract must exist before the duty of good faith and

---

[3] Although the mortgage contract was not attached to the proposed second amended complaint, the Court may consider it as a matter of public record and as a document necessarily embraced by the proposed pleading.  *See Baker v. CitiMortgage, Inc.*, No. 16-cv-1103(DSD/JSM), 2016 WL 4697334, at *2 (D. Minn. Sept. 7, 2016); *Anderson v. Wells Fargo Home Mortg.*, No. 14-cv-5013 (ADM/JSM), 2016 WL 755615, at *3 n.3 (D. Minn. Feb. 25, 2016).

fair dealing can be implied by law into it." *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012).

The Court next addresses the proposed allegations that Wells Fargo breached the mortgage contract by failing to credit Plaintiffs for an early mortgage payment and failing to properly allocate payments. The elements of a breach of contract claim under Minnesota law are: "(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages." *Parkhill v. Minnesota Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000) (citations omitted), *aff'd*, 286 F.3d 1051 (8th Cir. 2002). Wells Fargo does not contest the adequacy of the first, second, and fourth elements, but contends Plaintiffs have not adequately alleged a breach of the mortgage contract.

Wells Fargo first argues that Plaintiffs' proposed allegation that they made the "agreed mortgage payment of $1,433.95" from March to August 2016 is inconsistent with the allegation that Wells Fargo increased their mortgage payment amount "in July 2016 from $1,433.95 to $1,496.85." (Def.'s Mem. Opp'n at 15 (citing Proposed Second Am. Compl. ¶¶ 41-42).) But Wells Fargo has misread the proposed pleading. Plaintiffs propose to allege that they paid the agreed mortgage payment of $1,433.95 from March to August 2016. (Proposed Second Am. Compl. ¶ 40.) Plaintiffs then allege that Wells Fargo unilaterally increased the amount to $1,496.85 in September 2016. (Proposed Second Am. Compl. ¶ 41-42.) There is no inconsistency in these allegations. And even if there were, the inconsistency would not equate to a failure to adequately allege a breach of contract.

21

Wells Fargo next argues that the mortgage contract requires Plaintiffs to pay the principal and interest "when due" and establishes the order in which payments will be applied. However, Wells Fargo points out, the mortgage does not require it to accept payments for less than the amount due or to apply deficient payments in any particular manner. (*See* Def.'s Mot. Dismiss App. Ex. A at 3-5 [Doc. No. 34-1].)

It is true that Plaintiffs have not identified any particular provision of the mortgage that required Wells Fargo to allocate deficient payments or early payments in a particular manner. Plaintiffs do not agree, however, that their payments were deficient. Moreover, the appropriate allocation of an early or deficient payment has not been fully briefed by the parties so as to permit this Court to determine, in the context of a motion to amend, whether an improper allocation would constitute a breach of the mortgage contract. Consequently, the Court will grant Plaintiffs leave to amend their breach of contract claim as that claim pertains to a breach of the mortgage contract, including Plaintiffs' request to allege a breach of the covenant of good faith and fair dealing. By this ruling, the Court is not concluding that the proposed allegations could survive a motion to dismiss, but only that the Court cannot conclude on the present record that the proposed claim is "clearly frivolous." *See Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 695 (8th Cir. 1981) (directing that leave to amend should be denied only when the amendments are "clearly frivolous").

### G.    Formatting and Stylistic Amendments

Wells Fargo does not oppose any formatting and stylistic amendments that do not relate directly to the causes of action discussed above. Consequently, the Court grants

Plaintiff leave to make any such purely formatting and stylistic amendments.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' Motion to Amend Complaint [Doc. No. 43] is **GRANTED IN PART** and **DENIED IN PART** as set forth fully herein, and Plaintiffs must file an amended complaint that comports with this Order within seven days.

Dated: April 12, 2018                            s/ *Hildy Bowbeer*
                                                 HILDY BOWBEER
                                                 United States Magistrate Judge