# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**Samuel Zean, Eunice Zean**
*Plaintiffs*

vs.

**Wells Fargo Bank, N.A.; et. al.**
*Defendants*

---

**Case No. 17-cv-03817 (JNE/HB)**

# SECOND AMENDED COMPLAINT

PLAINTIFFS, as and for their causes of action against the above-named Defendant (other defendants having been previously dismissed), state and allege as follows:

## INTRODUCTION

1.      Plaintiffs are individuals desperately trying to save their home from defendant Wells Fargo Bank, N.A. (hereinafter "Wells Fargo"). Wells Fargo has tortiously, and without authority, threatened to foreclose and evict Plaintiffs and their children. Despite Plaintiffs making every mortgage payment required under their mortgage contract, Wells Fargo has called Plaintiffs on a nearly daily basis demanding that Plaintiffs pay an additional $4,528.00 or relinquish their home. Wells Fargo's representatives illegally harassed Mr. and Mrs. Zean while threatening to take their home. As a direct result of Wells Fargo's tortious conduct, Plaintiffs developed anxiety and other serious, medically diagnosed health concerns. Plaintiffs bring this action in order to put a stop to Well Fargo's illicit conduct.

## STATEMENT OF JURISDICTION & VENUE

1.      This Court has Jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331. This court has supplemental jurisdiction over Plaintiffs' state law claims as these claims rise from the same case and controversy.

1

2.      Venue is proper pursuant to 28 U.S.C. § 1391(1) and (2) because the cause of action arose within the State of Minnesota and Defendant regularly conducts business in the same.

## PARTIES

3.      Plaintiffs are adult residents of Hennepin County, Minnesota.

4.      Defendant Wells Fargo Bank, N.A. is a national bank.

5.      Plaintiff is informed and believes, and thereon alleges, that at all times relevant Defendant conducted business in the State of Minnesota and in the County of Hennepin.

## FACTS

6.      In January of 2015, Plaintiffs purchased a home located at 8708 62nd Avenue North, Brooklyn Park, Minnesota.

7.      Since this time Plaintiffs and their children have occupied this home as their primary residence.

8.      Mr. and Mrs. Zean are not wealthy individuals; they carefully budget for the needs of their family.

9.      Because the Zeans do not have substantial savings, it is very important that the Zean family has a consistent mortgage payment.

10.      It is for this reason that Plaintiffs selected a 30-year fixed rate mortgage when purchasing their home.

11.      From January of 2015 until January of 2016, Plaintiffs paid their mortgage without incident.

12.      In January of 2016, Plaintiffs received a document entitled Escrow Account Disclosure Statement and Notice of New Mortgage Payment.

13.     The statement in question required Mr. and Mrs. Zean to pay a predicted escrow deficiency of $502.35 or the Zeans' mortgage payment on their home would increase.

14.     Lacking sufficient savings, Mr. and Mrs. Zean began paying the increased mortgage amount.

15.     Approximately three months later, in March of 2016, Plaintiff received another Escrow Account Disclosure Statement and Notice of New Mortgage Payment.

16.     This notice required the Zeans to pay an additional $456.46 or the mortgage on their family home would once again increase.

17.     As a family of moderate income, the Zeans contacted Wells Fargo and voiced their concerns regarding Wells Fargo's repeated demands for additional escrow funds.

18.     Wells Fargo thereafter suggested the purchase of an escrow buydown ("Escrow Buydown").

19.     At no time did Wells Fargo represent that the purchase of the Escrow Buydown modified or changed the terms of their existing mortgage.

20.     Wells Fargo stated this financial product would assure that Zeans' fixed rate mortgage payment would remain at or below $1,433.95 until March of 2017.

21.     With this knowledge and belief, Mr. and Mrs. Zean agreed that the Zeans would purchase the Escrow Buydown product for $680.24.

22.     More specifically, Mr. and Mrs. Zean entered into a verbal agreement and contract with Defendant Wells Fargo, whereby the Zeans would pay the alleged escrow shortage amount of $456.46 and would also purchase the Escrow Buydown for $680.24, resulting in a total payment to Wells Fargo of 1,136.70.

23.     The sale of escrow buydowns is common in the mortgage industry; buydowns result in the consumer paying escrow accounts in full versus the consumer financing his or her escrow contributions by making monthly escrow contributions.

24.     In consideration for the agreement, the parties agreed that Wells Fargo would hold the $680.24 interest free and the bank would thereafter allocate one twelfth of the buydown amount to the Zean escrow account each month until March of 2017.

25.     Wells Fargo further assured the Zeans that it would not perform any additional escrow adjustments until after March of 2017.

26.     Pursuant to the agreement between the parties, the Zeans paid Defendant Wells Fargo $1,136.70 on March 21, 2016.

27.     From March until August of 2016, the Zeans paid their agreed mortgage amount of $1433.95.

28.     Despite its contract with the Zean family, in July of 2016, Wells Fargo again unilaterally increased the Zeans' mortgage payment with the change to take effect in September 2016.

29.     Without notifying the Zeans, Wells Fargo increased the Zeans' mortgage payment and withdrew from Mr. Zean's bank account (hereinafter the "Zeans' bank account" or "Plaintffs' checking account") the amount of $1,496.85.

30.     This caused an overdraft in the Zeans' bank account held at U.S. Bank, N.A. (hereinafter "U.S. Bank").

31.     U.S. Bank thereafter assessed a fee for the overdraft caused by Wells Fargo.

32.     On or about September 2, 2016, the Zeans received another escrow account disclosure statement and notice of new mortgage notifying the Zeans of the increased mortgage payment, which had previously been withdrawn from their account.

33.     A check dated September 2, 2016 for the sum of $330.05 accompanied the notice.

34.     The check was allegedly issued because of a projected escrow "overage amount."

35.     Yet the notice in question increased the Zeans' mortgage payment from $1,433.95 to $1,496.85 to cover a predicted escrow shortfall.

36.     Contrary to the two other notices of new mortgage, Wells Fargo did not offer the Zeans the option to buydown their escrow.

37.     On information and belief, Plaintiffs allege that Wells Fargo manufactured a deficiency in order to increase the Zeans' monthly mortgage payment.

38.     The Zeans protested this unnecessary change, which both refunded money to them and required them to finance their escrow account versus buying down any deficiency.

39.     On September 2, 2016, Plaintiffs contacted Wells Fargo and questioned why the bank was attempting to increase Plaintiffs' mortgage payment while simultaneously refunding Plaintiffs' money, and Wells Fargo responded, "[The] Real Estate Settlement Procedures Act (RESPA) Guidelines do not prohibit multiple analyses to the customer's loan. It is not illegal for Wells Fargo to analyze the loan periodically."

40.     The Zeans pointed out to Defendant Wells Fargo that although the bank's decision to reallocate Plaintiffs' payment was not prohibited by RESPA, Wells Fargo's decision was prohibited by its contract with Plaintiffs, namely the parties' previously agreed March 2016 Escrow Buydown agreement.

41.     In attempting to reason with Wells Fargo, Plaintiff repeatedly inquired regarding the reason Wells Fargo increased Plaintiffs' escrow account.

42.     Wells Fargo initially took the position that an increase in taxes was the issue.

43.     Plaintiff has pointed out that Plaintiffs' taxes are identical to those of 2015.

44.     After learning this information Wells Fargo reversed its claim, thereafter stating that the increase in the escrow requirement was due to an insurance premium increase obtained from State Farm.

45.     State Farm, however, denies that it provided Wells Fargo with any such information.

46.     On information and belief, Plaintiff alleges that Wells Fargo manufactured untrue reasons to adjust the escrow accounts on loans it services.

47.     During the September 2, 2016 telephone conversations with Wells Fargo, Plaintiffs spoke with Mr. Robert Saavedra, who claimed to be one of Wells Fargo's customer service supervisors located at Wells Fargo's San Bernardino, California location.

48.     Mr. Saavedra stated that in March of 2016, Wells Fargo had previously offered an incorrect or inappropriate investment contract/ escrow buydown.

49.     Mr. Saavedra thereafter attempted to sell the Zeans a new buydown for the sum of $690.00; Mr. Saavedra assured the Zeans that this sum would reestablish their previously agreed monthly payment of $1,433.95.

50.     In September of 2016, the Zeans also notified Wells Fargo that they would not cash the check for $330.05 because this sum was not to be returned under the Buydown Agreement between the parties.

51.     During the same conversation the Zeans also expressly informed Wells Fargo that they did not authorize the increased mortgage amount of $1,496.85 to be withdrawn from their checking account.

52.     Plaintiffs disputed Wells Fargo's unauthorized September auto draft from Plaintiffs' checking account both verbally and in writing.

53.     Plaintiffs sent Wells Fargo a letter dated September 24, 2016 outlining the agreement and stating that Plaintiffs only authorized the sum of $1433.95 to be withdrawn from their account.

54.     Wells Fargo assured Plaintiffs that $1,496.85 would not be withdrawn in the future.

55.     Despite Plaintiffs' explicit request, in October of 2016, Wells Fargo again withdrew the sum of $1,496.85 from Plaintiffs' checking account.

56.     Wells Fargo's October withdrawal also caused a deficiency in Plaintiffs' bank account, for which Plaintiffs were again charged a fee.

57.     Plaintiffs again disputed this withdrawal verbally and in writing.

58.     In a letter dated October 3, 2016, sent via certified mail, Mr. Zean was direct, writing, "My wife and I have specifically informed Wells Fargo Home Mortgage, [sic.]that it stop and reframe [sic.] from automatically debiting the amount of $1,496.85 from our account and that Wells Fargo Home Mortgage is not authorized to take that amount form [sic.] our account but $1,433.95."

59.     Wells Fargo again assured Plaintiffs that the greater sum would not be withdrawn in the future.

60.     In a letter dated November 2, 2016, responding to Plaintiffs' Electronic Funds Transfer Act ("EFTA") disputes, Wells Fargo claimed to have sent a letter on July 8, 2016, advising that Wells Fargo was unilaterally adjusting Plaintiffs' monthly electronic withdrawals.

61.     In the same letter, Wells Fargo acknowledged in writing that the Escrow Buydown agreement existed.

62.     Specifically, in the letter Well Fargo states, "After researching your account, we found that you made a payment of $680.24 to pay part of your escrow account in advance. This is

what's referred to as an escrow buydown, and this was intended to reduce your monthly payment to $1433.95. *This payment was to be effective until March 2017.*" (Emphasis added.)

63.     In the same letter, Wells Fargo states that escrow accounts are typically reviewed on an annual basis: The bank wrote, "Your escrow account is reviewed on an annual basis, and your payment may be adjusted at that time. Because your loan originated on January 2, 2015, the first escrow analysis was completed on January 8, 2016."

64.     Plaintiffs never received any July notice, and such a notice would be inconsistent with the September 2, 2016 dating on the check Wells Fargo sent Plaintiffs in September.

65.     Despite its previous promise and despite Plaintiffs' express demands that Wells Fargo cease withdrawing additional funds from their Plaintiffs' checking account, in November of 2016, Wells Fargo again withdrew the sum of $1,496.85 from Plaintiffs' checking account.

66.     Defendant Wells Fargo's November withdrawal again caused a deficiency in Plaintiffs' checking account, for which Plaintiffs were charged a fee by U.S. Bank.

67.     Plaintiffs disputed Defendant Wells Fargo's unauthorized withdrawals; however, Defendant Wells Fargo refused to refund Plaintiffs' funds.

68.     In December of 2016, Plaintiffs removed auto pay from their Wells Fargo Mortgage Account.

69.     On December 2, 2016, Plaintiffs made their agreed mortgage payment of $1,433.95.

70.     On December 3, 2016, Defendant Wells Fargo allegedly mailed a notice to Plaintiff that Wells Fargo was refusing to credit Plaintiffs' mortgage payment.

71.     Specifically, Defendant Wells Fargo stated that it would not credit the account until an additional $62.90 was received.

72.    In mid-December of 2016, Defendant Wells Fargo began an aggressive campaign of debt collection calls to Plaintiffs' cellular phones.

73.    Having not received Wells Fargo's notice, before leaving for an extended trip, Plaintiffs made an additional mortgage payment of $1,433.95 on December 23, 2016.

74.    This sum was intended to cover Plaintiffs' January mortgage payment in advance.

75.    Plaintiffs twice confirmed with Wells Fargo that the payment would be applied to Plaintiffs' January mortgage payment.

76.    However, upon receipt of the funds, Defendant Wells Fargo instead allocated $62.90 of this payment to Plaintiffs' December 2, 2016 mortgage payment and allocated the remainder to the principal of Plaintiffs' loan.

77.    Wells Fargo failed to inform Plaintiffs that it was changing the agreed allocation of the payment without their knowledge or consent.

78.    In January of 2017, Wells Fargo recorded that Plaintiffs failed to make a mortgage payment.

79.    Wells Fargo thereafter credited Plaintiffs' escrow account with the $330.05 it previously attempted to return to Plaintiffs.

80.    Unaware of Wells Fargo's error in failing to credit Plaintiffs' account for their January payment, Plaintiffs paid what they believed to be their agreed mortgage payment of $1,433.95 in February of 2017.

81.    Wells Fargo sent no additional correspondence to Plaintiffs until February 8, 2017.

82.    In the first notice received by Plaintiffs, Wells Fargo stated that it had received Plaintiffs' payment of $1,433.95, but the bank would not credit this amount to Plaintiffs' account until an additional $62.90 was received.

83.     Only days later, on or about February 18, 2017, Plaintiffs received a mortgage statement alleging a past due payment amount of $2,993.70.

84.     This overdue sum was a direct result Wells Fargo's failure to credit Plaintiffs' January payment of $1,433.95, Plaintiffs' February payment of $1433.95, and Wells Fargo's reallocation of $303.05 back to Plaintiffs' escrow account.

85.     The overdue sum indicated on the notice was calculated as the sum of January and February's mortgage payments, which Wells Fargo refused to credit despite Plaintiffs paying the agreed amount of $1,433.95 each month.

86.     The same statement required a total payment of $4,528.00 by March 1, 2017.

87.     The total amount due was calculated as the sum of the overdue amount $2993.70, the March payment allegedly due of $1,496.85, and a $37.45 late charge.

88.     Upon reviewing this statement, Plaintiff Samuel Zean experienced a panic attack requiring continued medical treatment, including medication.

89.     Moreover, since October 2016, Mr. Zean has required ongoing medical treatment for extreme anxiety, sleeplessness, headaches, and stress related to the possibility of Mr. and Mrs. Zean losing their family home.

90.     On several occasions both Mr. and Mrs. Zean, both individually and collectively, informed Wells Fargo that Mr. Zean was and is suffering from a serious medical condition as a result of the stress caused by Wells Fargo's suggestion that the Zeans may lose their family home due to wrongful foreclosure.

91.     On several occasions over several months Plaintiffs tirelessly informed Wells Fargo that they believed an accounting error had occurred in Wells Fargo's calculation of the amount due on their mortgage.

92.    Both Mr. and Mrs. Zean sent Wells Fargo several qualified written requests for information about their mortgage.

93.    Most of these written requests were sent via certified mail while others were sent via fax.

94.    Wells Fargo responded to the Zeans' first request for information by drafting a letter that became the basis for a form letter that was repeatedly sent to Mr. and Mrs. Zean upon their requests for further clarification.

95.    The letter in question responded only to Mr. and Mrs. Zeans' issue with Wells Fargo's July 2016 escrow analysis.

96.     The letter failed in all ways to explain how the amount demanded by Wells Fargo was calculated.

97.    Specifically, the letter failed to address the primary reason for the Zeans' deficiency, namely that the Zeans' January mortgage payment, paid on December 23, 2016, was applied not as a mortgage payment, but instead as a payment toward principal.

98.    In addition to resending the form letter, Wells Fargo responded by repeatedly calling Mr. and Mrs. Zean and demanding payment of $4,528.00.

99.    Despite Mr. and Mrs. Zean both repeatedly informing Wells Fargo that neither individual wanted the bank to call their cellular telephones, the calls continued.

100.    From September of 2016 to the present, Plaintiffs repeatedly attempted to reason with Defendant Wells Fargo.

101.    Wells Fargo rebuffed Plaintiffs in all attempts to amicably resolve this matter.

102.    Despite demanding the sum of $4,528.00 and threatening foreclosure, Defendant Wells Fargo has reported to all of the major consumer reporting agencies that Plaintiffs are current on their mortgage and have no outstanding past due amount.

103.     Mr. Zean has on several occasions highlighted this fact to Defendant Wells Fargo, who has affirmatively stated that there appear to be "issues" with Plaintiffs' mortgage account.

104.     Regardless, Wells Fargo has made no effort to correct these issues.

105.     On February 16, 2017, in an attempt to draw attention to Plaintiffs' issue, Mr. and Mrs. Zean both mailed written reinvestigation disputes to defendants Experian Information Solutions, Inc., (hereinafter "Experian"), Equifax Information Services, LLC, (hereinafter "Equifax") and Trans Union, LLC (hereinafter "Trans Union")("the CRAs).

106.     In their disputes Mr. and Mrs. Zean outlined the issues with their mortgage and noted that the scheduled payment amounts reflected on their credit reports were not accurate.

107.     In its response, Wells Fargo took the wholly inconsistent approach that Plaintiffs' mortgage payment was $1,496.00, the higher post-July 2016 escrow analysis payment amount, yet Plaintiffs also owed no past due amount.

108.     Wells Fargo's response to the CRAs was internally inconsistent and inconsistent with the March 2017 and April 2017 billing statements Wells Fargo sent to Plaintiffs.

109.     The March, April, and May 2017 billing statements sent to Plaintiffs both showed an overdue payment amount of $2,993.70 and a total payment due of $4,528.00.

110.     Still Experian, Equifax and Trans Union all responded alleging that they had investigated the matter and had found Wells Fargo's reporting to be accurate with respect to the amount due and the monthly payment amount.

111.     Despite the simple mathematical impossibility of the CRAs' position with respect to Defendant's reporting of Plaintiffs' mortgage, the CRAs made absolutely no attempt to explain what steps they had taken to investigate Plaintiffs' disputes.

112.    On June 28, 2017, Mr. Zean met with a Wells Fargo banker regarding an unrelated matter involving the bank account of his church, for which Mr. Zean is the treasurer.

113.    When the banker attempted to pull up the church accounts, a message displayed on the teller's highly visible computer screen that Mr. Zean's mortgage was delinquent and in default.

114.    Mr. Zean was highly embarrassed, ashamed, and humiliated by Wells Fargo's unnecessary and unauthorized display of false private information to an employee and others who had no business knowing about such information.

115.    On information and belief, Plaintiffs allege that Wells Fargo knew that the disclosures or communication included defamatory remarks.

116.    Since July of 2016, Mr. Zean and his wife have experienced extreme stress directly stemming from Defendant's willful and malicious conduct.

117.    This stress is a natural consequence of the Zean family's potential homelessness, directly caused by Wells Fargo's tortious behavior and patent refusal to correct its billing errors.

118.    In fact, the stress on Mr. Zean has been so great that Mr. Zean has been diagnosed with a stress-related medical condition, hemicrania continua, resulting from Wells Fargo's unjust, reckless, and intentional conduct.

119.    Mr. Zean has incurred medical bills, co-payments, and prescription medication payments all as a direct result of Wells Fargo's conduct.

120.    Wells Fargo's unchecked conduct has increased in aggressiveness.

121.    On at least two occasions Wells Fargo has sent persons to Plaintiffs' home to examine the property.

122.    On several occasions, the latest occurring on July 17, 2017, Wells Fargo sent persons to Plaintiffs' home to post pre-foreclosure notices on the property.

123.     Plaintiff comes now asking for the following relief:


First Claim for Relief

Request for Declaratory Judgment

*Minn. Stat. § 555.01*

Against Defendant Wells Fargo


124.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

125.     Plaintiffs respectfully request Declaratory Judgment that Plaintiffs have made all contractually required payments on their mortgage and that Plaintiffs owe Defendant Wells Fargo no additional money.


Second Claim for Relief

Fraud

Against Defendant Wells Fargo


126.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

127.     On March 21, 2016, Plaintiff placed an outbound telephone call to Defendant with the express purpose of gaining a more consistent mortgage payment on their fixed-rate home mortgage.

128.     During the conversation, Defendant offered Plaintiffs a consistent mortgage payment until March of 2017 in exchange for a one-time purchase of an escrow buydown.

129.    At the time the promise was made, Defendant did not intend to honor the agreement.

130.    Defendant knew that Plaintiffs would rely on Defendant's representation that Plaintiffs' mortgage payment would remain consistent at $1,433.95 until March of 2017.

131.    Plaintiffs did rely on Defendant's statements and representations and paid Defendant $1,136.70 for an escrow buydown on March 21, 2016.

132.    After accepting payment, Defendant willfully failed to honor its agreement.

133.    In September of 2016, Defendant withdrew a sum from Plaintiffs' bank account greater than $1,433.95.

134.    Plaintiffs were harmed by the resulting overdraft fee.

135.    On September 8, 2016, Defendant committed a second fraud when its employee named "Jeannie" stated that Wells Fargo would not make a second automated withdrawal of the amount of $1,496.85.

136.    The conversation between "Jeannie" and the Zeans occurred via telephone.

137.    At the time this second promise was made, Defendant did not intend to honor the agreement.

138.    Plaintiffs relied on Defendant's statement and did not cancel automatic payment on their mortgage.

139.    Plaintiffs were harmed in that in October of 2016, when Defendant again withdrew a sum from Plaintiffs' bank account greater than $1,433.95.

140.    Plaintiffs were further harmed by Defendant's conduct.

141.    In October of 2016, Defendant committed a third fraud stating that it would not make a third automated withdrawal of the amount of $1,496.85.

142.    Plaintiffs relied on Defendant's statement and again did not cancel automatic payment on their mortgage.

143.    Plaintiffs were harmed in that in November of 2016 Defendant withdrew a sum from Plaintiffs' bank account greater than $1,433.95.

144.    Plaintiffs were harmed as a direct cause of Defendant's misrepresentations.


### Third Claim for Relief

### Breach of Contract

#### Against Defendant Wells Fargo


145.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

146.    A valid contract was formed between Plaintiffs and Defendant.

147.    Defendant breached the contract by unnecessarily increasing Plaintiffs' mortgage payment.

148.    Defendant committed a second breach of contract with respect to Plaintiff's written mortgage contract on the property.

149.    Specifically, Defendant willfully breached the Mortgage Security Instrument Contract when Defendant refused to credit Plaintiff's account for mortgage contract payments.

150.    Defendant further breached the written mortgage contract by failing to properly allocate payments made on the account.

151.    Specifically, Defendant unlawfully and without any authority or justification sent Plaintiffs' mortgage payments into an unapplied funds account instead of properly allocating the funds pursuant to the mortgage contract.

152.    Plaintiffs suffered damages as a result of Defendant's breach.


### Fourth Claim for Relief

### Violation of the Electronic Funds Transfer Act

*15 U.S.C. § 1693 Et Seq.*

Against Defendant Wells Fargo


153.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

154.    Defendant violated the EFTA and Regulation E, 12 C.F.R. § 205.17.

155.    Specifically, Defendant failed to properly investigate Plaintiffs' billing disputes.

156.    Defendant also failed to refrain from withdrawing funds from Plaintiffs' account when Defendant had been previously notified that Plaintiffs did not authorize withdrawal of the funds.


### Fifth Claim for Relief

### Violation of the Minnesota Consumer Fraud Act

*Minn. Stat. §325.68 et. seq.*

Against Defendant Wells Fargo


157.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

158.    Defendant made false statements in the connection with the sale of merchandise, namely the sale of escrow buydowns.

159.    Plaintiffs' request for injunction benefits the public in that the public has an interest in the prevention of unnecessary foreclosures.

160.    Plaintiffs' injuries are likely to be suffered by other individuals given the size and scope of Wells Fargo's mortgage portfolio.

161.    Defendant has also made statements regarding its widely applied practice of adjusting escrow accounts to bring accounts into a "mass-cycle."

162.    For these reasons Plaintiffs' claims are of interest to the general public and, more specifically, other Minnesota residents who have mortgages owned by or serviced by Wells Fargo.


Sixth Claim for Relief

Violation of the Minnesota Homeowners' Bill of Rights

*Minn. Stat. § 582.043 Et Seq.*

Against Defendant Wells Fargo


163.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

164.    Plaintiffs timely notified Defendants of their request to modify the allocation of mortgage escrow payments.

165.    Plaintiffs informed Defendant of their financial need to stabilize their mortgage payments by allocating payments in this manner.

166.    More specifically, Plaintiffs requested the right to buydown their escrow account versus financing their escrow contributions by combining escrow payments with their monthly mortgage payment.

167.    This request constituted a receipt for a loan modification or other loss mitigation option.

168.    Defendant failed to respond to Plaintiffs' request for loss mitigation though once annual escrow analyses and/ or escrow buydown.

169.    Defendant further failed to respond to Plaintiffs' repeated requests for information regarding why Defendant was demanding a payment of $4,528.00.

170.    Defendant had the loss mitigation option of properly allocating Plaintiffs' January 2017 mortgage payment made on December 23, 2016.

171.    Defendant failed to inform Plaintiff of this option.

172.    In so doing Defendant violated the Minnesota Homeowners' Bill of Rights.

173.    Defendant further failed to allocate Plaintiff's December payment in a reasonable manner, and instead allocated the payment in a manner highly likely to cause a deficiency in Plaintiffs' account.

174.    After repeated notice by Plaintiffs that Plaintiffs questioned the amount due, Defendant failed to made no attempt to review the information provided by Plaintiffs and, instead, attempted to force Plaintiffs into an unnecessary loan modification.

175.    This unnecessary modification violates the spirit of Minn. Stat. §582.043.

176.    In so doing, Defendant violated Minn. Stat. §582.043.


Seventh Claim for Relief

Negligent Violations of the Telephone Consumer Protection Act

*47 U.S.C. § 227 Et Seq.*

Against Defendant Wells Fargo

177.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

178.    Plaintiffs are informed and believe, and thereon allege, that Defendant made phone calls to Plaintiffs' cellular telephones via an "automatic telephone dialing system" (hereinafter "ATDS") as defined by 47 U.S.C. § 227 (a)(1).

179.    Plaintiffs each are, and at all times mentioned herein were,  "person(s)" as defined by 47 U.S.C. § 153 (39)

180.    Defendant is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153 (39).

181.    Plaintiffs' telephone numbers are assigned to a "cellular telephone service" as that term is used in 47 U.S.C. § 227 (b)(1)(A)(ii).

182.    On information and belief, Wells Fargo utilizes an ATDS to collect alleged debts from consumers.

183.    Plaintiffs are familiar with ATDS equipment and thereon allege that Wells Fargo called their personal cell phones with ATDS equipment. Plaintiffs base this belief on the following facts:

     a.    A pause or delay accompanied many of these calls, whereby a representative was not immediately available.

     b.    On several occasions Defendant's auto-dialing system would dial Plaintiffs; when Plaintiffs answered these phone calls a representative was entirely unavailable resulting in a period of dead air (hereinafter "dead air calls").

184.    Plaintiffs are informed and believe, and therefore allege, that these telephone calls constituted calls that were not for emergency purposes as defined by 47 U.S.C. § 227 (b)(1)(A)(i).

185.    The calls were made to Plaintiffs' cell phones via ATDS without Plaintiffs' prior express consent.

186.    Defendant placed or caused to be placed these telephone calls in violation of 47 U.S.C. § 227 (b)(1).

187.    The foregoing acts and omissions of Defendant constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

188.    As a result of Defendant's negligent violations of 47 U.S.C. § 227 et seq., Plaintiffs are entitled to an award of $500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

189.    Plaintiffs are also entitled to seek injunctive relief prohibiting such conduct in the future.


Eighth Claim for Relief

Knowing and/ or Willful Violations of the Telephone Consumer Protection Act

*47 U.S.C. § 227 Et Seq.*

Against Defendant Wells Fargo


190.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

191.     The foregoing acts and omissions of Defendant constitute numerous and multiple

knowing and/ or willful violations of the TCPA, including but not limited to each and every one

of the above-cited provisions of 47 U.S.C. § 227 et seq.

192.     As a result of Defendant's knowing and/ or willful violations of 47 U.S.C. § 227 et seq.,

Plaintiffs are entitled to treble damages, as provided by statute, up to $1,500.00 for each and

every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).


Ninth Claim for Relief

Negligent Violations of the Fair Credit Reporting Act

15 U.S.C. §1681, Et Seq.

Against Defendant Wells Fargo


200.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as

though fully stated herein.

202.     The foregoing acts and omissions of Defendant Wells Fargo constitute numerous and

multiple negligent violations of the FCRA by Defendant Wells Fargo, including, but not limited

to, 15 U.S.C. §1681s-2.

203.     Defendant's violations resulted in Defendant furnishing inaccurate information about

Plaintiffs.

Tenth Claim for Relief

Knowing and/ or Willful Violations of the Fair Credit Reporting Act

*15 U.S.C. §1681, Et Seq.*

Against Defendant Wells Fargo

193.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

194.    The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the FCRA, including but not limited to failing to conduct a reasonable investigation with respect to the disputed information, and/or failing to review all relevant information before reporting back to the national credit reporting agencies, in violation of 15 U.S.C. § 1681s-2.

195.    Defendant's violations resulted in Defendant furnishing inaccurate information about Plaintiffs.

Eleventh Claim for Relief

Intentional Infliction of Emotional Distress

Against Defendant Wells Fargo

196.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

197.    Defendant willfully disregarded the rights of Plaintiffs, namely Plaintiffs' right to be free from harassing, computer-dialed phone calls and Plaintiffs' right to the quiet enjoyment of their home.

198.    Defendant willfully and without authority trespassed onto Plaintiffs' property for the purpose of posting a pre-foreclosure notice to Plaintiffs' front door.

199.    Defendant made calls, posted notices, and sent statements and letters threatening foreclosure with the express purpose of causing Plaintiffs such emotional distress that Plaintiffs

pay Defendant money not due and owing, enter into an unneeded mortgage modification, or allow the bank to take their home.

200.    Defendant thereby acted in an extreme and outrageous manner.

201.    Plaintiffs suffered severe distress from Defendant's actions and statements.

202.    Specifically, Plaintiffs felt and were, in fact, violated and/ or stolen from by Defendant.

203.    Plaintiffs suffered from headaches, shortness of breath, frustration, fear, and anxiety and depression as a direct result of Defendant's intentional behavior and/ or statements.

204.    Mr. Zean has been diagnosed with stress-related medical conditions including, but not limited to, hemicrania continua.


Twelfth Claim for Relief

Invasion of Privacy – Intrusion Upon Seclusion

Against Defendant Wells Fargo


205.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

206.    Defendant repeatedly and continuously called Plaintiffs' cellular telephones to collect an alleged debt that Plaintiffs did not owe.

207.    Defendant continued to place calls to Plaintiffs' cellular telephones after Plaintiffs made repeated requests that Defendant cease its calling.

208.    These calls were a constant, frustrating reminder to Plaintiffs that Defendant was threatening to take their home without proper authority.

209.    These calls were disruptive to Plaintiffs in that they interfered with Plaintiffs' daily activities.

210.    Defendant willfully and without authority trespassed onto Plaintiffs' property for the purpose of posting a pre-foreclosure notice to Plaintiffs' front door.

211.    Defendant placed over 300 automated calls to Plaintiffs' cell phones.

212.    These calls occurred twice a day every day for period of several months.

213.    Defendant willfully ignored all the warnings and appeals from Mrs. Zean about her husband's health vulnerability and susceptibility to pain, suffering, and injuries as a result of Defendant's continuous actions and conducts.

214.    Defendant thereby acted in an extreme and outrageous manner in its intrusion into Plaintiffs' private life.

215.    Plaintiffs suffered severe distress from Defendant's conduct, actions, and statements.

216.    Specifically, Plaintiffs felt and were, in fact, violated and/ or stolen from by Defendant.


Thirteenth Claim for Relief

Invasion of Privacy – Publication of Private Facts

Against Defendant Wells Fargo


217.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

218.    Defendant distributed an untrue message that Plaintiffs were delinquent in paying their mortgage.

219.    Defendant distributed an untrue message that Plaintiffs had defaulted on their mortgage.

220.    Defendant distributed this message over the bank's computer system in a manner that persons and employees with no reasonable need to know the information were notified of Plaintiffs' private financial details.

221.    Defendant made this distribution despite Defendant's own Code of Ethics and Business

Conduct, which states that the bank will "preserve customers' confidentiality" and their express

admission that confidentiality has always been "an essential part of the financial industry's

business."

222.    Regarding customers' confidentiality, Defendant specifically promises and states, "Wells

Fargo's customers give us private information about themselves and rightfully trust us to keep

this information in confidence."

223.    Defendant again specifically states, "Today we have technology that enables us to keep

more information about customers than ever before."

224.    Defendant again specifically states, "Recognizing this, Wells Fargo has placed special

emphasis on the appropriate collection, storage, and use of customer information. Moreover,

Wells Fargo has provided team members with access to computers, electronic mail, the intranet,

and the internet."

225.    Defendant again specifically states, "This access is a privilege that carries special

responsibilities."

226.    When addressing the roles of its employees in relation to its customers' privacy

protection, Defendant further states, "As a team member, you will have access to confidential

information about Wells Fargo, its customers, team members, and vendors which you are

obligated to protect from unauthorized disclosure."

227.    Defendant again specifically states, "Such information is intended solely for use within

Wells Fargo and is limited to those with a business need-to-know."

228.    Defendant further states, "You may not access confidential information without a

business purpose."

229.    Defendant further states, "You must not disclose confidential information you have obtained in the course of your employment to any other team member unless the other team member has a business need to know the information for the performance of his or her duties on behalf of Wells."

230.    Defendant again specifically states, "Wells Fargo protects the private, personal, and proprietary information of customers, vendors, and team members."

231.    Defendant again specifically states, "[We] must be careful to honor those agreements."

232.    Defendant further states, "Improper release of or unauthorized access to confidential information damages our customer's trust in Wells Fargo and can result in loss of business and even legal action."

233.    Defendant promises and states, "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law; these measures include computer safeguards and secured files and buildings."

234.    The above promises and statements by Defendant are an admission by Defendant that it owed certain duties to its customers to protect customers' private information from any unauthorized access or disclosure.

235.    In Defendant's reckless disclosure of false confidential information, Defendant grossly violated all of its policies, codes of conduct, and promises as outlined in its Code of Ethics and Business Conduct in regards to its customers, which resulted in injury to Mr. Zean's reputation and health.

236.    After the disclosure, Mr. Zean immediately experienced a panic attack, suffered anxiety and headaches, and had to see his doctor.

237.    Mr. Zean continued to suffer from panic attacks, anxiety, and constant headaches.

238.     Defendant's disclosure cast a stigma upon Plaintiffs and resulted in shame, disgrace, dishonor, embarrassment, and humiliation because the disclosure by virtue of its falsehood and malicious implications depicted Plaintiffs as good-for-nothing, unreliable, untrustworthy, and undependable.

239.     On at least one occasion Defendant broadcast Plaintiffs' private information in a manner such that a large number of other individuals in the bank could see Defendant's false statement that Plaintiffs were delinquent in paying their mortgage.

Fourteenth Claim for Relief

Defamation

Against Defendant Wells Fargo

240.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

241.     On Thursday, June 28, 2017, Defendant disclosed to at least one third party that Plaintiffs were 58 days delinquent on their May 2017 mortgage payment.

242.     Specifically, Defendant negligently disclosed these and other untrue statements to at least one employee with no legitimate interest or need to know the information.

243.     Defendant's employee in return disclosed the defamatory statements to the branch manager, which accounts for a second publication of the disclosure.

244.     Plaintiffs are especially upset and disappointed that Defendant's branch manager saw the disclosure because the manager is also a Liberian immigrant and as such is a member of the very small Twin Cities Liberian community; hence, the disclosure is bound to spread in their community and further embarrass and humiliate Plaintiffs.

245.    Defendant also disclosed to at least one additional third party that Plaintiffs were in default on their loan.

246.    This fact was untrue as Plaintiffs paid their May 2017 mortgage payment of $1,496.85 on May 5, 2017.

247.    The statement was published with malice as evidenced by Defendant's violation of its own confidentiality and nondisclosure policies and its pattern of harassment, intimidation, and bullying of Plaintiffs.

248.    Defendant's false statements were made knowingly or with reckless disregard for their truthfulness or falsity.

249.    Defendant knew the statements were false as Defendant had no reasonable basis for believing them to be true.

250.    Defendant's statement regarding Mr. Zean's alleged failure to manage his money also paints Mr. Zean's Church in a negative manner.

251.    Defendant was reckless if not intentional in not foreseeing or anticipating such scenarios as that which Mr. Zean experienced and was greatly embarrassed and humiliated.

252.    Prior to Defendant's disclosure of false information about Plaintiffs, Defendant's employee greatly respected Mr. Zean and knew only little about Mr. Zean, which was limited to the fact that Mr. Zean was a treasurer and business customer of his Church account and was affiliated with his Church as a religious person.

253.    Defendant has repeatedly, undeservedly, and unjustifiably harassed and intimidated Plaintiffs by repeatedly displaying similar false statements on Plaintiffs' online account login page time and again.

Fifteenth Claim for Relief

Compelled Self Publication Defamation

Against Defendant Wells Fargo

254.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

255.    In Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 888 (Minn. 1986), the Minnesota Supreme Court recognized the theory of compelled self-publication.

256.    Mr. Zean was compelled to repeat a self-publication of the defamation to Defendant's employee via email communication about the disclosure and the embarrassment and humiliation the disclosure caused him.

257.    Defendant's branch manager called Mr. Zean on Friday, July 7, 2017, to ask Mr. Zean about the incident. Under the circumstances, Mr. Zean was again compelled reiterate the false to information to Defendant's branch manager before correcting it.

**Jury Demand**

258.    Plaintiffs hereby demands a trial by jury.

**Prayer for Relief**

WHEREFORE, Plaintiffs, by and through their attorney, respectfully pray for Judgment to be entered in favor of Plaintiffs and against Defendant as follows:

   a.    Declaratory Judgment that Plaintiffs do not owe Defendant any additional money;

b.      An order compelling Defendant Wells Fargo to remove all funds from the suspect account and apply such monies pursuant to the mortgage contract;

c.      Statutory damages;

d.      Actual damages;

e.      Restitution;

f.      Punitive damages;

g.      Injunctive relief prohibiting such conduct in the future;

h.      Reasonable attorney's fees, litigation expenses, and cost of suit; and

i.      Any other relief deemed appropriate by this Honorable Court.

Dated: March 16, 2018          Respectfully Submitted,

MADGETT LAW

s/ David J.S. Madgett
David J.S. Madgett (#0390494)
619 South Tenth Street
Suite 301
Minneapolis, MN 55404
(612) 470-6529
dmadgett@madgettlaw.com

ATTORNEY FOR PLAINTIFFS