# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

**Samuel Zean, Eunice Zean**
*Plaintiffs*

vs.

**Wells Fargo Bank, N.A.; et. al.**
*Defendants*

_____

**Case No. 17-cv-03817 (JNE/HB)**


**AMENDED PROPOSED THIRD
AMENDED COMPLAINT**

PLAINTIFFS, as and for their causes of action against the above-named Defendant (other

defendants having been previously dismissed), state and allege as follows:

## INTRODUCTION

1.      Plaintiffs are individuals desperately trying to save their home from defendant Wells Fargo

Bank, N.A. (hereinafter "Wells Fargo"). Wells Fargo has tortiously, and without authority,

threatened to foreclose and evict Plaintiffs and their children. Despite Plaintiffs making every

mortgage payment required under their mortgage contract, Wells Fargo has called Plaintiffs on a

nearly daily basis demanding that Plaintiffs pay an additional $4,528.00 or relinquish their home.

Wells Fargo's representatives illegally harassed Mr. and Mrs. Zean while threatening to take their

home. As a direct result of Wells Fargo's tortious conduct, Plaintiffs developed anxiety and other

serious, medically diagnosed health concerns. Plaintiffs bring this action in order to put a stop to

Well Fargo's illicit conduct.

## STATEMENT OF JURISDICTION & VENUE

1.      This Court has Jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §

1331. This court has supplemental jurisdiction over Plaintiffs' state law claims as these claims

rise from the same case and controversy.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(1) and (2) because the cause of action arose within the State of Minnesota and Defendant regularly conducts business in the same.

### PARTIES

3.      Plaintiffs are adult residents of Hennepin County, Minnesota.

4.      Defendant Wells Fargo Bank, N.A. is a national bank.

5.      Plaintiff is informed and believes, and thereon alleges, that at all times relevant Defendant conducted business in the State of Minnesota and in the County of Hennepin.

### FACTS

6.      In January of 2015, Plaintiffs purchased a home located at 8708 62ND Avenue North, Brooklyn Park, Minnesota.

7.      Since this time Plaintiffs and their children have occupied this home as their primary residence.

8.      Mr. and Mrs. Zean are not wealthy individuals; they carefully budget for the needs of their family.

9.      Because the Zeans do not have substantial savings, it is very important that the Zean family has a consistent mortgage payment.

10.      It is for this reason that Plaintiffs selected a 30-year fixed rate mortgage when purchasing their home.

11.      From January of 2015 until January of 2016, Plaintiffs paid their mortgage without incident.

12.      In January of 2016, Plaintiffs received a document entitled Escrow Account Disclosure Statement and Notice of New Mortgage Payment.

13.     The statement in question required Mr. and Mrs. Zean to pay a predicted escrow deficiency of $502.35 or the Zeans' mortgage payment on their home would increase.

14.     Lacking sufficient savings, Mr. and Mrs. Zean began paying the increased mortgage amount.

15.     Approximately three months later, in March of 2016, Plaintiff received another Escrow Account Disclosure Statement and Notice of New Mortgage Payment.

16.     This notice required the Zeans to pay an additional $456.46 or the mortgage on their family home would once again increase.

17.     As a family of moderate income, the Zeans contacted Wells Fargo and voiced their concerns regarding Wells Fargo's repeated demands for additional escrow funds.

18.     Wells Fargo thereafter suggested the purchase of an escrow buydown ("Escrow Buydown").

19.     At no time did Wells Fargo represent that the purchase of the Escrow Buydown modified or changed the terms of their existing mortgage.

20.     Wells Fargo stated this financial product would assure that Zeans' fixed rate mortgage payment would remain at or below $1,433.95 until March of 2017.

21.     With this knowledge and belief, Mr. and Mrs. Zean agreed that the Zeans would purchase the Escrow Buydown product for $680.24.

22.     More specifically, Mr. and Mrs. Zean entered into a verbal agreement and contract with Defendant Wells Fargo, whereby the Zeans would pay the alleged escrow shortage amount of $456.46 and would also purchase the Escrow Buydown for $680.24, resulting in a total payment to Wells Fargo of 1,136.70.

23.     The sale of escrow buydowns is common in the mortgage industry; buydowns result in the consumer paying escrow accounts in full versus the consumer financing his or her escrow contributions by making monthly escrow contributions.

24.     In consideration for the agreement, the parties agreed that Wells Fargo would hold the $680.24 interest free and the bank would thereafter allocate one twelfth of the buydown amount to the Zean escrow account each month until March of 2017.

25.     Wells Fargo further assured the Zeans that it would not perform any additional escrow adjustments until after March of 2017.

26.     Pursuant to the agreement between the parties, the Zeans paid Defendant Wells Fargo $1,136.70 on March 21, 2016.

27.     From March until August of 2016, the Zeans paid their agreed mortgage amount of $1433.95.

28.     Despite its contract with the Zean family, in July of 2016, Wells Fargo again unilaterally increased the Zeans' mortgage payment with the change to take effect in September 2016.

29.     Without notifying the Zeans, Wells Fargo increased the Zeans' mortgage payment and withdrew from Mr. Zean's bank account (hereinafter the "Zeans' bank account" or "Plaintffs' checking account") the amount of $1,496.85.

30.     This caused an overdraft in the Zeans' bank account held at U.S. Bank, N.A. (hereinafter "U.S. Bank").

31.     U.S. Bank thereafter assessed a fee for the overdraft caused by Wells Fargo.

32.     On or about September 2, 2016, the Zeans received another escrow account disclosure statement and notice of new mortgage notifying the Zeans of the increased mortgage payment, which had previously been withdrawn from their account.

33.     A check dated September 2, 2016 <u>as escrow overage</u> for the sum of $330.05 accompanied the notice.

34.     The check was allegedly issued because of a projected escrow "overage amount."

35.     Yet the notice in question increased the Zeans' mortgage payment from $1,433.95 to $1,496.85 to cover a predicted escrow shortfall.

36.     Contrary to the two other notices of new mortgage, Wells Fargo did not offer the Zeans the option to buydown their escrow.

37.     On information and belief, Plaintiffs allege that Wells Fargo manufactured a deficiency in order to increase the Zeans' monthly mortgage payment.

38.     The Zeans protested this unnecessary change, which both refunded money to them and required them to finance their escrow account versus buying down any deficiency.

39.     On September 2, 2016, Plaintiffs contacted Wells Fargo and questioned why the bank was attempting to increase Plaintiffs' mortgage payment while simultaneously refunding Plaintiffs' money, and Wells Fargo responded, "[The] Real Estate Settlement Procedures Act (RESPA) Guidelines do not prohibit multiple analyses to the customer's loan. It is not illegal for Wells Fargo to analyze the loan periodically."

40.     The Zeans pointed out to Defendant Wells Fargo that although the bank's decision to reallocate Plaintiffs' payment was not prohibited by RESPA, Wells Fargo's decision was prohibited by its contract with Plaintiffs, namely the parties' previously agreed March 2016 Escrow Buydown agreement.

41.     In attempting to reason with Wells Fargo, Plaintiff repeatedly inquired regarding the reason Wells Fargo increased Plaintiffs' escrow account.

42.     Wells Fargo initially took the position that an increase in taxes was the issue.

43.     Plaintiff has pointed out that Plaintiffs' taxes are identical to those of 2015.

44.     After learning this information Wells Fargo reversed its claim, thereafter stating that the increase in the escrow requirement was due to an insurance premium increase obtained from State Farm.

45.     State Farm, however, denies that it provided Wells Fargo with any such information.

46.     On information and belief, Plaintiff alleges that Wells Fargo manufactured untrue reasons to adjust the escrow accounts on loans it services.

47.     During the September 2, 2016 telephone conversations with Wells Fargo, Plaintiffs spoke with Mr. Robert Saavedra, who claimed to be one of Wells Fargo's customer service supervisors located at Wells Fargo's San Bernardino, California location.

48.     Mr. Saavedra stated that in March of 2016, Wells Fargo had previously offered an incorrect or inappropriate investment contract/ escrow buydown.

49.     Mr. Saavedra thereafter attempted to sell the Zeans a new buydown for the sum of $690.00; Mr. Saavedra assured the Zeans that this sum would reestablish their previously agreed monthly payment of $1,433.95.

50.     In September of 2016, the Zeans also notified Wells Fargo that they would not cash check their balance payment sent as escrow overage for $330.05 because this sum was not to be returned under the Buydown Agreement between the parties.

51.     During the same conversation the Zeans also expressly informed Wells Fargo that they did not authorize the increased mortgage amount of $1,496.85 to be withdrawn from their checking account.

52.     Plaintiffs disputed Wells Fargo's unauthorized September auto draft from Plaintiffs' checking account both verbally and in writing.

53.     Plaintiffs sent Wells Fargo a letter dated September 24, 2016 outlining the agreement and stating that Plaintiffs only authorized the sum of $1433.95 to be withdrawn from their account.

54.     Wells Fargo assured Plaintiffs that $1,496.85 would not be withdrawn in the future.

55.     Despite Plaintiffs' explicit request, in October of 2016, Wells Fargo again withdrew the sum of $1,496.85 from Plaintiffs' checking account.

56.     Wells Fargo's October withdrawal also caused a deficiency in Plaintiffs' bank account, for which Plaintiffs were again charged a fee.

57.     Plaintiffs again disputed this withdrawal verbally and in writing.

58.     In a letter dated October 3, 2016, sent via certified mail, Mr. Zean was direct, writing, "My wife and I have specifically informed Wells Fargo Home Mortgage, [sic.]that it stop and reframe [sic.] from automatically debiting the amount of $1,496.85 from our account and that Wells Fargo Home Mortgage is not authorized to take that amount form [sic.] our account but $1,433.95."

59.     Wells Fargo again assured Plaintiffs that the greater sum would not be withdrawn in the future.

60.     In a letter dated November 2, 2016, responding to Plaintiffs' Electronic Funds Transfer Act ("EFTA") disputes, Wells Fargo claimed to have sent a letter on July 8, 2016, advising that Wells Fargo was unilaterally adjusting Plaintiffs' monthly electronic withdrawals.

61.     In the same letter, Wells Fargo acknowledged in writing that the Escrow Buydown agreement existed.

62.     Specifically, in the letter Well Fargo states, "After researching your account, we found that you made a payment of $680.24 to pay part of your escrow account in advance. This is

what's referred to as an escrow buydown, and this was intended to reduce your monthly payment to $1433.95. *This payment was to be effective until March 2017.*" (Emphasis added.)

63.     In the same letter, Wells Fargo states that escrow accounts are typically reviewed on an annual basis: The bank wrote, "Your escrow account is reviewed on an annual basis, and your payment may be adjusted at that time. Because your loan originated on January 2, 2015, the first escrow analysis was completed on January 8, 2016."

64.     Plaintiffs never received any July notice, and such a notice would be inconsistent with the September 2, 2016 dating on the check Wells Fargo sent Plaintiffs in September.

65.     Despite its previous promise and despite Plaintiffs' express demands that Wells Fargo cease withdrawing additional funds from their Plaintiffs' checking account, in November of 2016, Wells Fargo again withdrew the sum of $1,496.85 from Plaintiffs' checking account.

66.     Defendant Wells Fargo's November withdrawal again caused a deficiency in Plaintiffs' checking account, for which Plaintiffs were charged a fee by U.S. Bank.

67.     Plaintiffs disputed Defendant Wells Fargo's unauthorized withdrawals; however, Defendant Wells Fargo refused to refund Plaintiffs' funds.

68.     In December of 2016, Plaintiffs removed auto pay from their Wells Fargo Mortgage Account.

69.     On December 2, 2016, Plaintiffs made their agreed mortgage payment of $1,433.95.

70.     On December 3, 2016, Defendant Wells Fargo allegedly mailed a notice to Plaintiff that Wells Fargo was refusing to credit Plaintiffs' mortgage payment.

71.     Specifically, Defendant Wells Fargo stated that it would not credit the account until an additional $62.90 was received.

72.     In mid-December of 2016, Defendant Wells Fargo began an aggressive campaign of debt collection calls to Plaintiffs' cellular phones.

73.     Having not received Wells Fargo's notice, before leaving for an extended trip, Plaintiffs made an additional mortgage payment of $1,433.95 on December 23, 2016.

74.     This sum was intended to cover Plaintiffs' January mortgage payment in advance.

75.     Plaintiffs twice confirmed with Wells Fargo that the payment would be applied to Plaintiffs' January mortgage payment.

76.     However, upon receipt of the funds, Defendant Wells Fargo instead allocated $62.90 of this payment to Plaintiffs' December 2, 2016 mortgage payment and allocated the remainder to the principal of Plaintiffs' loan.

77.     Wells Fargo failed to inform Plaintiffs that it was changing the agreed allocation of the payment without their knowledge or consent.

78.     In January of 2017, Wells Fargo recorded that Plaintiffs failed to make a mortgage payment.

79.     Wells Fargo thereafter credited Plaintiffs' escrow account with their balance of their own funds or alleged escrow overage of $330.05 it previously attempted to return to Plaintiffs.

80.     Unaware of Wells Fargo's error in failing to credit Plaintiffs' account for their January payment, Plaintiffs paid what they believed to be their agreed mortgage payment of $1,433.95 in February of 2017.

81.     Wells Fargo sent no additional correspondence to Plaintiffs until February 8, 2017.

82.     In the first notice received by Plaintiffs, Wells Fargo stated that it had received Plaintiffs' payment of $1,433.95, but the bank would not credit this amount to Plaintiffs' account until an additional $62.90 was received.

83.     Only days later, on or about February 18, 2017, Plaintiffs received a mortgage statement alleging a past due payment amount of $2,993.70.

84.     This overdue sum was a direct result Wells Fargo's failure to credit Plaintiffs' January payment of $1,433.95, Plaintiffs' February payment of $1433.95, and Wells Fargo's reallocation of $303.05 back to Plaintiffs' escrow account.

85.     The overdue sum indicated on the notice was calculated as the sum of January and February's mortgage payments, which Wells Fargo refused to credit despite Plaintiffs paying the agreed amount of $1,433.95 each month.

86.     The same statement required a total payment of $4,528.00 by March 1, 2017.

87.     The total amount due was calculated as the sum of the overdue amount $2993.70, the March payment allegedly due of $1,496.85, and a $37.45 late charge from January 2017.

88.     Upon reviewing this statement, Plaintiff Samuel Zean experienced a panic attack requiring continued medical treatment, including medication.

89.     Moreover, since October 2016, Mr. Zean has required ongoing medical treatment for extreme anxiety, sleeplessness, headaches, and stress related to the possibility of Mr. and Mrs. Zean losing their family home.

90.     On several occasions both Mr. and Mrs. Zean, both individually and collectively, informed Wells Fargo that Mr. Zean was and is suffering from a serious medical condition as a result of the stress caused by Wells Fargo's suggestion that the Zeans may lose their family home due to wrongful foreclosure.

91.     On several occasions over several months Plaintiffs tirelessly informed Wells Fargo that they believed an accounting error had occurred in Wells Fargo's calculation of the amount due on their mortgage.

92.     Both Mr. and Mrs. Zean sent Wells Fargo several qualified written requests for information about their mortgage.

93.     Most of these written requests were sent via certified mail while others were sent via fax.

94.     Wells Fargo responded to the Zeans' first request for information by drafting a letter that became the basis for a form letter that was repeatedly sent to Mr. and Mrs. Zean upon their requests for further clarification.

95.     The letter in question responded only to Mr. and Mrs. Zeans' issue with Wells Fargo's July 2016 escrow analysis.

96.      The letter failed in all ways to explain how the amount demanded by Wells Fargo was calculated.

97.     Specifically, the letter failed to address the primary reason for the Zeans' deficiency, namely that the Zeans' January mortgage payment, paid on December 23, 2016, was applied not as a mortgage payment, but instead as a payment toward principal.

98.     In addition to resending the form letter, Wells Fargo responded by repeatedly calling Mr. and Mrs. Zean and demanding payment of $4,528.00.

99.     Despite Mr. and Mrs. Zean both repeatedly informing Wells Fargo that neither individual wanted the bank to call their cellular telephones, the calls continued.

100.    From September of 2016 to the present, Plaintiffs repeatedly attempted to reason with Defendant Wells Fargo.

101.    Wells Fargo rebuffed Plaintiffs in all attempts to amicably resolve this matter.

102.    Despite demanding the sum of $4,528.00 and threatening foreclosure, Defendant Wells Fargo has reported to all of the major consumer reporting agencies that Plaintiffs are current on their mortgage and have no outstanding past due amount.

103.    Mr. Zean has on several occasions highlighted this fact to Defendant Wells Fargo, who has affirmatively stated that there appear to be "issues" with Plaintiffs' mortgage account.

104.    Regardless, Wells Fargo has made no effort to correct these issues.

105.    On February 16, 2017, in an attempt to draw attention to Plaintiffs' issue, Mr. and Mrs. Zean both mailed written reinvestigation disputes to defendants Experian Information Solutions, Inc., (hereinafter "Experian"), Equifax Information Services, LLC, (hereinafter "Equifax") and Trans Union, LLC (hereinafter "Trans Union")("the CRAs).

106.    In their disputes Mr. and Mrs. Zean outlined the issues with their mortgage and noted that the scheduled payment amounts reflected on their credit reports were not accurate.

107.    In its response, Wells Fargo took the wholly inconsistent approach that Plaintiffs' mortgage payment was $1,496.00, the higher post-July 2016 escrow analysis payment amount, yet Plaintiffs also owed no past due amount.

108.    Wells Fargo's response to the CRAs was internally inconsistent and inconsistent with the March 2017 and April 2017 billing statements Wells Fargo sent to Plaintiffs.

109.    The March, April, and May 2017 billing statements sent to Plaintiffs both showed an overdue payment amount of $2,993.70 and a total payment due of $4,528.00.

110.    Still Experian, Equifax and Trans Union all responded alleging that they had investigated the matter and had found Wells Fargo's reporting to be accurate with respect to the amount due and the monthly payment amount.

111.    Despite the simple mathematical impossibility of the CRAs' position with respect to Defendant's reporting of Plaintiffs' mortgage, the CRAs made absolutely no attempt to explain what steps they had taken to investigate Plaintiffs' disputes.

112.    On June 28, 2017, Mr. Zean met with a Wells Fargo banker regarding an unrelated matter involving the bank account of his church, for which Mr. Zean is the treasurer.

113.    When the banker attempted to pull up the church accounts, a message displayed on the teller's highly visible computer screen that Mr. Zean's mortgage was delinquent and in default.

114.    Mr. Zean was highly embarrassed, ashamed, and humiliated by Wells Fargo's unnecessary and unauthorized display of false private information to an employee and others who had no business knowing about such information.

115.    On information and belief, Plaintiffs allege that Wells Fargo knew that the disclosures or communication included defamatory remarks.

116.    Since July of 2016, Mr. Zean and his wife have experienced extreme stress directly stemming from Defendant's willful and malicious conduct.

117.    This stress is a natural consequence of the Zean family's potential homelessness, directly caused by Wells Fargo's tortious behavior and patent refusal to correct its billing errors.

118.    In fact, the stress on Mr. Zean has been so great that Mr. Zean has been diagnosed with a stress-related medical condition, hemicrania continua, resulting from Wells Fargo's unjust, reckless, and intentional conduct.

119.    Mr. Zean has incurred medical bills, co-payments, and prescription medication payments all as a direct result of Wells Fargo's conduct.

120.    Wells Fargo's unchecked conduct has increased in aggressiveness.

121.    On at least two occasions Wells Fargo has sent persons to Plaintiffs' home to examine the property.

122.    On several occasions, the latest occurring on July 17, 2017, Wells Fargo sent persons to Plaintiffs' home to post pre-foreclosure notices on the property.

123.    Plaintiff comes now asking for the following relief:

First Claim for Relief

Request for Declaratory Judgment

*Minn. Stat. § 555.01*

Against Defendant Wells Fargo

124.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

125.    In State of Minnesota vs. Barbara Mae Joseph, the Minnesota Court of Appeals held, "A declaratory judgment is an alternative and optional remedy available to parties who want the courts to declare their 'rights, status, and other legal relations' * * *." Minn. Stat. § 555.01 (1998).

126.    The Court further held "A contract may be construed either before or after there has been a breach thereof." Minn. Stat. § 555.03 (1998); *Harrington v. Fairchild*, 235 Minn. 437, 441, 51 N.W.2d 71, 73 (1952) (declaratory judgment action proper to determine parties' rights under contract even though there had been no default).

127.    Plaintiffs are asking the Court to declare that they do not owe Wells Fargo any past due payment(s) in any amounts, nor any late fee as Wells Fargo has alleged.

<u>Second Claim for Relief</u>

<u>Fraud/Negligent Misrepresentation/Fraudulent Nondisclosure</u>

<u>Against Defendant Wells Fargo</u>

128.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

129.    On May 2, 2017, the issue of whether or not Wells Fargo would admit it misrepresented material fact to Plaintiffs was answered when Wells Fargo sent Plaintiffs

a letter dated May 2, 2017.

130.    In the letter, Wells Fargo acknowledged to Plaintiffs it made the alleged

representation to them on March 21, 2016.

**Wells Faro's Representation related to Past and Present Events of Material Fact-—
Regarding Plaintiffs' Balance Payment of $465.46 (Negligent Nondisclosure)**

131.    Mr. Zean called "Wells Fargo Home Mortgage" on March 16, 2016 and spoke

with a woman who identified herself as Michele.

132.    Mr. Zean called Michele back on 0321/2016, and made a payment to her based on

her representation on 0316/2016 and establishment of a contract with him 03/21/2016.

133.    Mr. Zean had a conversation with Michele about the escrow analysis Wells Fargo

had conducted on them on March 15, 2016.

134.    Michele knowingly made representation about benefits that Plaintiffs would

receive if they agree to pay the escrow shortage of $456.46.

135.    Michele claimed the payment would take an immediate effect to eliminate the

shortage on Plaintiffs' account for 12 months and would create a much lower monthly

payment for 12 months from $1,533.83 to $1,495.79.

136.    The escrow statement that Michele was referring states as follows on Plaintiffs on

January 8, 2016 and March 16, 2016 escrow statements:

> "You may use either of the following options to restore your required account balance: a)
> "Pay the entire escrow shortage amount of $456.46 using the shortage payment coupon and
> your new Mortgage payment will be $1,495.79;" and b) "Pay the escrow account shortage of
> $456.46 in 12 months installment of $38.04 which we've included in your new payment
> amount of $1,533.83." See also Plaintiffs July 8, 2016 escrow statement. *See* **[Exhibit 2].**

137.    Michele and Wells Fargo also made further representation as follows:

> "If your current payment includes an amount to cover a previous escrow shortage,
> this amount will be added. If your current payment includes an adjustment for extra
> funds you deposited to your escrow, account this amount will be deducted."

138.    Plaintiffs relied on the representation that Michele made to them verbally on over

the telephone on 03/16/2016 and 03/21/2016 and the representation in Wells Fargo in 0316/2016 escrow statement quoted above.

139.    As a result, Mr. Zean paid the amount of $1.136.79 on March 21, 2016.

140.    Mr. Zean made the payment to Michele via a "telephone call."

141.    Michele knowingly made representation she knew or had reason to know was entirely false and misleading based on her advance knowledge that Wells Fargo had already scheduled an escrow review of Plaintiffs' loan on 07/08/2016 to take effect on 09/01/2016, which would virtually render Plaintiffs' payment a total financial loss.

142.    Michele made representation to Plaintiffs on March 16, 2016 and also on March 21, 2016, she knew Wells Fargo did not intend to honor.

143.    Michele unequivocally knew that 1) Wells Fargo entered the agreement with actual knowledge it would forfeit it; 2) by forfeiting, Wells Fargo would deprive Plaintiffs of the fruit of their payment; 3) Wells Fargo would require and demand money from Plaintiffs re-modify their payment; and 4) Wells Fargo had already made an internal decision and scheduled an escrow review of Plaintiffs' loan for 07/08/2016 for the purpose of bringing their loan into what it called a "mass analysis circle."

144.    Specially, Wells Fargo asked Plaintiffs to pay option 1, and "Pay the entire escrow shortage amount of $456.46 using the shortage payment coupon and their new Mortgage payment will be $1,495.79 for 12 months."

145.    Wells Fargo also provided as option 2, which is to "pay the escrow account shortage of $456.46 in 12 months installment of $38.04 which would produce new payment amount of $1,533.83."

146.    Relying on the representation by Michele and Wells Fargo, Plaintiffs made a lump sum payment of $456.46 with an expected monthly mortgage payment of $1,495.79 for a

*total of 12 months*.

147.    But instead of performing as it represented to Plaintiffs, Wells Fargo unjustly

terminated the agreement after just 4 months of operation before the 12 months ended.

148.    Wells Fargo applied the $456.46 for only 4 of the 12 months of coverage period

promised and refused to credit Plaintiffs the remaining balance of $304.32 from the

$456.46.

149.    Wells Fargo failed and refused to do as it represented in either of the two options,

it represented above to Plaintiffs through Michele and also in its March 16, 2016 escrow

statement.

**The Math of Option 1: Pay A Lump Sum of $456.48; and Option 2: Pay A Monthly
Installment Of $38.04 (Fraudulent Nondisclosure)**

150.    The 12-months period x $38.04 = $456.48. This is the amount that Michele orally

represented, and Wells Fargo also represented in its March 16, 2016 escrow statement to

Plaintiffs.

151.    But Wells Fargo only covered 4 months of the12 months. 4 x $38.04 = $152.16.

152.    The remaining 8 months x $38.04 = $304.32 is the available balance that Wells

Fargo should have refunded, or deducted from Plaintiffs' new escrow payment of $560.66

which it generated on July 8, 2016 but failed.

153.    Wells Fargo and Michele did not disclose that Plaintiffs' payment would not be

refunded if Wells Fargo run a new escrow analysis on Plaintiffs' loan.

154.    Wells Fargo has failed to provide any explanation or accountability for the

balance payment of $304.32.

155.    Mr. Zean called Wells Fargo Home Mortgage and spoke with a supervisor named

Robert Saavedra via "telephone" who is located in San Bernardino California.

156.    Mr. Saavedra told Mr. Zean on September 2, 2017 that because Wells Fargo ran

its July 8, 2016 escrow review on Plaintiffs' loan, it zero out Plaintiffs' payment.

157.    But in spite of Mr. Saavedra's late explanation, Mr. Saavedra admission does not

expunge or erase Wells proven misrepresentations.

**Wells Faro's Representation related to Past and Present Events of Material Fact-—**
**Regarding Plaintiffs' Balance Payment of $680.24 (Fraudulent Nondisclosure)**

158.    Additionally, Michele further represented that Wells Fargo would spread

Plaintiffs' remaining balance payment of $680.24 from their payment of $1,136.70 to

cover *11 total months*.

159.    Plaintiffs were told that their payment was calculated by dividing the $680.24 by

11 months which amounted to $61.84.

160.    Michele further told Mr. Zean the $61.84 was then deducted from their payment

of $1,495.79, for a payment of $1,433.95 to take an immediate effect.

161.    Wells Fargo confirmed this representation in writing in a letter dated May 2, 2017.

162.    However, Wells Fargo in furtherance breached the second agreement and

thereafter, unilaterally attempted to refund Plaintiffs the remaining balance of $330.05

from their payment of $680 on July 10, 2016 in the disguise of an "escrow overage."

163.    Wells Fargo sent Plaintiffs a letter dated July 10, 2017 that stated: "You have an

escrow account balance overage of $330.05 for which we have issued the attached check.

This check amount reflects a refund based on your escrow account analysis and may be

due to smaller than expected tax and/or insurance payments made from our escrow

analysis yearly review schedule."

164.    But this was a misrepresentation because first, it was the balance from Plaintiffs'

own payment of $1,136.79 they had paid to Michele on 03/21/2016 via telephone.

165.     Second, Wells Fargo and Michele had represented, Wells Fargo would not return

any balance to Plaintiffs but would use the money for the intended purpose in the manner

provided as already explained above.

166.     Wells Fargo knowingly did not deduct Plaintiffs' balance payment of $330.05

from their new escrow shortage amount of $560.66, which still would have lowered their

monthly mortgage payment.

167.     Instead, Wells Fargo refunded the $330.05 to Plaintiffs and misrepresented the

nature of the refund, plus demanded more money from Plaintiffs in order to re-modify

their loan.

168.     Indeed, the alleged misrepresentations by Wells Fargo on March 16, 2016 in its

escrow statement and by Michele on March 16, and 21, 2016, related to past and current

events, which support a fraud claim under Minnesota law.

**<u>Proven Confirmation of Fraud by Wells Fargo and (Other Negligent Misrepresentation by
Wells Fargo Home Mortgage Specialists)</u>**

169.     On September 2, 2016, Mr. Zean called Wells Fargo and spoke with a Wells

Fargo Customer Service Supervisor named Robert Saavedra.

170.     Mr. Saavedra represented he was located at the Wells Fargo customer care center

in San Bernardino California.

171.     Mr. Robert Saavedra acknowledged that Wells Fargo representative who Mr. Zean

had spoken with, knew and had actual knowledge that Wells Fargo was scheduled to

conduct a 3rd escrow review on Plaintiffs' loan on July 8, 2016, on March 16, 2016 and

when she accepted payment from them on March 21, 2016.

172.     Additionally, Mr. Saavedra told Plaintiffs Wells Fargo's representative should

have advised Plaintiffs to hold off and make their payment after Wells Fargo anticipated

escrow analysis of Plaintiffs' loan which was already scheduled for July 8, 2016.

173.     This admission by Mr. Saavedra reveals that before Wells Fargo and Michele

knowingly made false representation to Plaintiffs knowingly that Wells Fargo had already

made an internal decision to run an escrow review on Plaintiffs' loan.

174.     Plaintiffs relied on the representation and experienced loss of their funds in

reliance on the representation.

175.     Wells Fargo knowingly made false representation to Plaintiffs by providing two

separate misleading representations about the benefits Plaintiffs would receive in its

March 16, 2016 escrow analysis statement.

176.     Wells Fargo committed another negligent misrepresentation which triggered its

March 16, 2016 escrow analysis.

177.     After Plaintiffs questioned Wells Fargo Home Mortgage about its new hazard

insurance of $1080.40, Wells Fargo Home Mortgage sent Plaintiffs dated November 2,

2016, and stated the following:

>     "We updated your insurance premium to reflect the amount $1080.40 in
> April of 2016. We received a policy change notification that your coverage had
> increased to $262,500 with a new premium amount of $1080.40. The amount being
> collected in your escrow account for insurance is future policy."

178.     After receiving this representation from Wells Fargo Home Mortgage, Plaintiffs

requested that Wells Fargo Home Mortgage send them the "Notification" it claimed to

have received from American Family that shows a new premium of $1080.40 in 2016.

179.     Wells Fargo Home responded in a letter dated November 30, 2016 as follows:

>     "According to our record, we didn't receive a proper invoice from American Family
> Insurance. The renewal policy premium information was received directly from the
> insurance website under your policy number 22BB009701 for the policy term of January
> 2, 2016 through January 2, 2017."

180.     But this was a misrepresentation by Wells Fargo, as the $1080.40 was not

Plaintiffs' policy term premium that Wells Fargo paid in January but paid $1,136.70.

181.    Additionally, Plaintiffs specifically made inquiries about Wells Fargo's representation with American Family. American Family's response shows that Wells Fargo had misrepresented material fact.

182.    This fact establishes that Wells Fargo had intentionally manipulated and fraudulently triggered its July 8, 2016 escrow analysis of Plaintiffs' loan.

183.    Mr. Zean called "Wells Fargo Home Mortgage" on September 22, 2016 and spoke "Wells Fargo Home Mortgage" specialist named Chris.

184.    Chris was from Des Moines, Iowa according to a follow up call Zean later made to trace all those he spoke with on September 22, 2016.

185.    Like Mr. Saavedra, Chris also revealed information that indicated Michele knew Wells Fargo would run an escrow analysis on Plaintiffs' loan on 0708/2016 to bring their loan into a what he called *"mass analysis circle"* when she made representation to Plaintiffs.

186.    According to Chris, Plaintiffs' "mass analysis month was known to be conducted in July—which meant it was a known fact that Wells Fargo would run an escrow analysis on Plaintiffs only 4 months after promising 12 months of lower payments to Plaintiffs.

187.    Chris turned the phone over to his supervisor named Mercedes, also from Wells Fargo Home Mortgage, Des Moines Iowa location based on a follow up.

188.    Mr. Zean asked Mercedes to stop automatically debiting their mortgage payments.

189.    Mr. Zean further instructed Mercedes that Wells Fargo was not welcome to continue to take payments from their bank account henceforth.

190.    Mercedes agreed and unequivocally said, "OK" at the end of her conversation with Mr. Zean before she transferred the call to her boss.

191.    But although Mercedes represented "OK," not to continue automatic debits, Wells

Fargo forfeited on that representation and made another automatic debits from Plaintiffs'

bank account.

192.    Wells Fargo continued to debit the amount of $1,495.85 from Plaintiffs' account

in October 2016.

193.    Wells Fargo knew that Plaintiffs would rely on its representation that Plaintiffs'

mortgage payment would remain consistent at $1,433.95 until March of 2017.

194.    Plaintiffs did relied on Wells Fargo's statements and representations.

195.    In September of 2016, Defendant withdrew a sum from Plaintiffs' bank account greater

than $1,433.95 and Mercedes promised to ensure that Wells Fargo does not continue its

automatic debit but Wells Fargo failed.

196.    Wells Fargo again withdrew $1,496.85 which was quite more than Plaintiffs had authorized

Wells Fargo to withdraw in October 2016.

197.    Plaintiffs were again harmed by a second resulting overdraft fee in the amount of $38.

198.    As a result, Plaintiffs again called Wells Fargo Home Mortgage via telephone on October 8,

2016, and spoke with a Wells Fargo mortgage specialist named "Jennifer" and not Jeannie.

199.    Mr. Zean unequivocally informed Jennifer that Wells Fargo is not authorized to debit any

automatic payment from their bank account moving forward.

200.    Jennifer reassured Mr. Zean that Wells Fargo will stop its automatic withdrawal but state

that Wells Fargo would rely on Plaintiffs to continue to make their monthly mortgage payments.

201.    However, on November 1, 2016, Wells Fargo continued to automatically debit funds

Plaintiffs' bank account which caused Plaintiff yet a third overdraft fee.

202.    While Jennifer did not state her actual physical location, the answering service did

identified Jennifer's location as "Wells Fargo Home Mortgage."

22

203.    On September 22, 2016 Mr. Zean also spoke with Mr. Justine Magee via a telephone

conservation.

204.    Mr. Magee was said to be from "Wells Fargo Home Mortgage" and an executive resolution

specialist from the Des Moines Iowa location based on the inquiry Mr. Zean later made about him

through the Wells Fargo 1-800 number he gave Mr. Zean.

205.    Mr. Magee made representation to Mr. Zean to refund the September 1, 2016 overdraft

charge and asked Mr. Zean to fax him a copy of his overdraft charge for reimbursement.

206.    Mr. Zean relied on Mr. Magee representation and spent money to fax 10 pages of document

to Mr. Magee.

207.    Mr. Magee gave Mr. Zean his phone number 1-800-853-8516 ext. 1335621130. Mr. Magee

also gave Mr. Zean his fax number 1-866-363-0465 then asked Mr. Zean to fax him their demands.

208.    According to Mr. Magee, once he received the fax he represented he would respond.

209.    Mr. Magee represented a willingness to refund Plaintiffs' overdrafts fee by requesting Mr.

Zean to fax the statement containing their overdraft fee to him. Mr. Magee knew Mr. Zean's

reliance on his request would cause Mr. Zean money to fax the information to him.

210.    But Mr. Magee did not intent to respond to Mr. Zean once he received the fax.

211.    Once Mr. Magee got off the phone with Mr. Zean he failed to follow through on his

representation after Plaintiffs faxed a ten-page document to him at the fax number that he gave.

212.    Mr. Zean relied on Mr. Magee and Wells Fargo by spending his own money but to his

detriment since he spent his money on fax cost but in vein.

213.    This was a negligent misrepresentation because after receiving the faxed not only did Mr.

Magee not call back but he also failed to issue any refund of Plaintiffs' overdraft fee of $38.

214.    Wells Fargo committed a total of 3 separate unauthorized automated withdrawals of

$1,496.85 from Plaintiffs' bank account in September 2016, October 2016 and November 2016.

23

215.    Plaintiffs have proven, (1) a  false statement of material fact was made by Wells  Fargo,
Mr. Magee and Michele; (2) that there was advance knowledge on the part of the  Wells Fargo,
Mr. Magee and Michele, each of  whom made representation that was  knowingly false; (3) the
representations show intent on the part of Wells Fargo, Mr. Magee and Michele to deceive
their intended victims, Mr. and Mrs.  Zean;  (4)  there  were reasonable reliance by the
intended victims, Mr. and Mrs. Zean on the false representations; and (5) there were injury or
harm to the intended victims, Mr. and Mrs. Zean as a result of their reliance on the
representation.

216.    Plaintiffs were harmed as a direct cause of Defendant's repeated and multiple
misrepresentations.

Third Claim for Relief

Breach of Mortgage Contract/Mortgage Security Instrument Contract (Note)

Against Defendant Wells Fargo

217.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as
though fully stated herein.

218.    A valid contract was formed between Plaintiffs and Defendant.

219.    Defendant breached the contract and note by unnecessarily increasing Plaintiffs'
mortgage payment.

220.    Defendant committed a breach of contract and note with respect to
Plaintiff's written mortgage contract on the property.

221.    Specifically, Defendant willfully breached the Mortgage Security Instrument Contract
(note) when Defendant refused to credit Plaintiff's account for mortgage contract payments.

222.    Defendant further breached the written mortgage contract by failing to properly allocate

Payments made on the account.

223.     Specifically, Defendant unlawfully and without any authority or justification sent Plaintiffs' mortgage payments into an unapplied funds account instead of properly allocating the funds pursuant to the mortgage contract.

**Wells Fargo's <u>Mortgage Security Instrument Contract (note) and Mortgage Contract</u> Under Section 2, Monthly Payments of Taxes, Insurance and other Charges**

224.     On July 10, 2016 Wells Fargo disbursed $330.05 it claimed was Plaintiffs' escrow overage that must be refunded according to Wells Fargo.

225.     But Plaintiffs did not cash the check due to an ongoing dispute.

226.     As a result, on January 10, 2017, Wells Fargo improperly and unilaterally decided to breach section 2 of the mortgage contract by depositing the uncashed check of $330.05 as Plaintiffs' January 2017 mortgage payment although Plaintiffs had already paid their January 2017 mortgage payment on December 23, 2016.

227.     In so doing, Wells Fargo knowingly misappropriated Plaintiffs' refund as Wells Fargo was not authorized to utilize Plaintiffs' refund as it improperly did.

228.     If anything, Wells Fargo was prohibited by the mortgage contract from keeping or misappropriating Plaintiffs' refund as it saw fit.

229.     Wells Fargo was not authorized by Plaintiffs to deposit their personal funds as a payment and Wells Fargo's conduct was a direct and knowing breach of section 2 of the <u>Mortgage Security Instrument Contract (note)</u> which provides as follows:

> "If the amounts held by Lender for Escrow items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA…. If Borrower tenders to Lender the full payment of all sums Borrower's account shall be credited with the balance remaining for installment items (a), (b), and (C) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower."

**Further Breach of the <u>Mortgage Security Instrument Contract (note) and</u> Mortgage Contract by Wells Fargo under Section 6 (A), Borrower's Failure To Pay**

230.    Wells Fargo further breached the mortgage contract <u>and note</u> by improperly applied Plaintiffs' January 2016 payment to an unapplied fund account.

231.    Wells Fargo then wrongfully charging Plaintiff $37.45 in late fee after failing to appropriately allocate Plaintiffs' January 2017 payment which they paid on December 23, 2016.

232.    The mortgage contract specifically states as follows in regard a Borrower's failure to pay under Section 6 (A) Late Charge for Overdue Payments:

> "If Lender has not received the full monthly payment required by the Security Instrument, as described in Paragraph 4 (C) of this Note, by the end of the fifteen calendar days after the payment is due, Lender may collect a later charge in the amount of 4.000% percent of the overdue amount of payment."

233.    Wells Fargo consented and accepted Plaintiffs' January 2017 mortgage payment in advance on December 23, 2016.

234.    A late charge according to the mortgage contract should only be charged by the end of the fifteen calendar days of each month after the payment is due and the full payment is not received according to second 8 (c) of the mortgage contract quoted above.

235.    Wells Fargo received the payment on time—in fact, ahead of the due date.

236.    Even if Plaintiffs were late, the mortgage contract did not permit Wells Fargo to charge Plaintiffs any late fee until after the 15th calendar day of each month and Plaintiffs have never been late past the 15th calendar day of any month.

237.    Wells Fargo's misallocation of Plaintiffs' January 2017 mortgage payment has unjustly and undeservingly sent Plaintiffs' mortgage into a deficit since January of 2017 and has resulted in Wells Fargo's unjustified, wrongful and unexplained monthly charges and default claim.

**Further Breach of the <u>Mortgage Security Instrument Contract (note)</u> by Wells Fargo Section 3. (Wells Fargo's Unapplied Funds Account of Plaintiffs' is a breach of the Mortgage Contract <u>and note</u>)**

238.    The mortgage contract prohibits Wells Fargo's misallocating of early payments.

239.     Under Section 5 of the mortgage contract regarding Borrower's right to prepay early and lender obligation to accept such prepayment, provides that borrower can pay interest on the amount prepaid for the remainder of the month.

240.     It further explains that early payments are required to be accepted by Wells Fargo and applied or allocated accordingly in the same order or allocation as all other regular mortgage payments.

**Application of an Early or Deficient Payment and their Appropriate Allocation under the Mortgage Contract**

*241.*     The mortgage contract specifically set forth the following terms below for the allocation of *all payments.*

242.     The mortgage contract does not authorize misallocation or misappropriation of "early payments" or payments that are considered to be deficient payments under Section 3, which provides: '***All payments***' under paragraphs 1 and 2 shall be applied by Lender as follows:

   a) First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;
   b) Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;
   c) Third, to interest due under the Note;
   d) Fourth, to amortization of the principal of the Note; and
   e) Fifth, to late charges due under the Note.

243.     The evidence is clear that Wells Fargo breached the mortgage contract and note by improperly holding Plaintiffs' payments in an unapplied funds account, which Wells Fargo repeatedly acknowledged doing and did not apply as the mortgage contract mandates above.

244.     Wells Fargo's conduct is clearly in violation and breach of the mortgage contract and note which specifically provides as follows under sections 6 (b) and 9 (a) Default:

          Section 6 (b): "If Borrower default by falling to pay in full any monthly
     payment, then Lender may, except as limited by regulations of the Secretary in the case of
     payment defaults, require immediate payment in full of the principal balance remaining due
     and all accrued interest." Section 9 (a): "Grounds for Acceleration of Debt. a) Default.
     Lender may, except as limited by limited by regulations issued by the Secretary, in the case

of payment defaults, require immediate payment in full of all sums secured by this Security
Instrument if:

**(i)**   Borrowers defaults by failing to pay in full any monthly payment required by this Security
Instrument prior to or on the due date of the next monthly payment; or **(ii)** Borrower
defaults by failing, for a period of thirty days, to perform any other obligation contained in
this Security Instrument. *See* **[Exhibit 10, mortgage contract, Section 6 (b) and 9(a)]**

245.    Plaintiffs have offered evidence and fact show Wells Fargo intentionally fabricated a

wrongful debt and defraud against Plaintiffs in its attempt to financially exploit them and to

unjustly foreclose their house.

246.    Wells Fargo is in breach of the mortgage contract <u>and note</u> for initiating a false and

wrongful default, acceleration and foreclosure proceeding on Plaintiffs' loan.

247.    Plaintiffs had an escrow overage of $159.63 on July 10, 2017.

248.    Plaintiffs was entitled to a refund of that amount of $159.63.

249.    However, Wells Fargo informed Plaintiffs it confiscated Plaintiffs refund on July 10, 2017.

250.    But Wells Fargo's action is a clear and willful breach of the mortgage contract <u>and note</u>

which says as follows under Section 2:

> "If the amounts held by Lender for Escrow Items exceed the amounts permitted to be
> held by RESPA, Lender shall account to Borrower for the excess funds as required by
> RESPA….If Borrower tenders to Lender the full payment of all sums Borrower's account
> shall be credit credited with the balance remaining for installment items (a),(b), and (C) and
> any mortgage insurance premium installment that Lender has not become obligated to pay to
> the Secretary, and Lender shall promptly refund any excess funds to Borrower."

251.    Wells Fargo's confiscation of Plaintiffs' escrow overage refund of $159.63 is a clear

breach of the mortgage contract and <u>note because evidence shows Plaintiffs</u> are not in default.

252.    Importantly, Plaintiffs do not and never owe Wells Fargo any past due payments and

have offered evidence in support of their claim.

253.    Plaintiffs offered evidence that Wells Fargo demanded that they were contractually

obligated to make payments in the amounts as follows from December 2016 through March 2017:

Dec. 2016 ($1,496.85) + Jan. 2017 ($1,496.85) + Late Fees (37.45) + Feb. 2017 ($1,496.85) +

Mar. 2017 ($1,496.85) for a total payments of $6,024.85.

254.     Plaintiffs denied and refute that they were contractually obligated to pay $6,024.85 but $5,735.80 from December 2016 to March 2017.

255.     Notwithstanding, Plaintiffs offered evidence that they made a total payment of $6,065.85 from December 2016 through March 2017 for an overpayment of $41—plus their confiscated escrow overage of $159.63 for total overpayment of $200.63 to Wells Fargo.

**Wells Fargo's New Mortgage Contract  Breach <u>and Mortgage Security Instrument Contract</u>**

256.     Wells Fargo again breached the mortgage contract <u>and note</u> on 09/08/2018.

257.     Plaintiffs paid their correct mortgage payment of $1,630.63 on 09/08/2018.

258.     However, Wells Fargo then subtracted $1,503.27 from the payment of $1,630.63 and sent it into unapplied fund account as incorrect payment.

259.     Additionally, Wells Fargo sent Plaintiffs a separate billing statement that shows Wells Fargo also sent the remaining balance of 127. 36 into unapplied fund account.

260.     But Plaintiffs paid the correct single payment of $1,630.63 in cash at a local Wells Fargo's branch office in Brooklyn Park, on 09/08/2018 and were given a confirmation receipt.

261.     Plaintiffs were harmed as a direct cause of Defendant's repeated and multiple misrepresentations and were greatly damaged as a direct result of Defendant's breach.

Fourth Claim for Relief

Violation of the Electronic Funds Transfer Act

*15 U.S.C. § 1693 Et Seq.*

Against Defendant Wells Fargo

262.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

263.     Defendant violated the EFTA and Regulation E, 12 C.F.R. § 205.17.

264.     Specifically, Defendant failed to properly investigate Plaintiffs' billing disputes.

265.     Defendant also failed to refrain from withdrawing funds from Plaintiffs' account when Defendant had been previously notified that Plaintiffs did not authorize withdrawal of the funds.

Fifth Claim for Relief

Violation of the Minnesota Consumer Fraud Act

*Minn. Stat. §325.68 et. seq.*

Against Defendant Wells Fargo

266.     Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

267.     Defendant made false statements in the connection with the sale of merchandise, namely the sale of escrow buydown.

268.     Plaintiffs request for injunction benefits the public in that the public has an interest in the prevention of unnecessary foreclosures.

269.     Plaintiffs' injuries are likely to be suffered by other individuals given the size and scope of Wells Fargo's mortgage portfolio.

270.     Defendant has also made statements regarding its widely applied practice of adjusting escrow accounts to bring accounts into a "mass-analysis-cycle."

271.     For these reasons Plaintiffs' claims are of interest to the general public and, specifically, other Minnesota residents who have mortgages owned by or serviced by Wells Fargo.

272.     Additionally, it is Wells Fargo's regular business practice to send its escrow review statements to its new customers as well as to its current customers on an ongoing basis.

273.     Wells Fargo would then propose that its customers pay their escrow shortage payment in one lump sum payment as Wells Fargo had repeatedly proposed to Plaintiffs.

30

274.    Hence, Plaintiffs' cause of action benefits the public at large, advances state interests and enforcement will benefit the public at large because other similarly situated customers are receiving the same escrow analysis statements from Wells Fargo.

Sixth Claim for Relief

Violation of the Minnesota Homeowners' Bill of Rights

*Minn. Stat. § 582.043 Et Seq.*

Against Defendant Wells Fargo

275.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

276.    Plaintiffs timely notified Defendants of their request to modify the allocation of mortgage escrow payments.

277.    Plaintiffs informed Defendant of their financial need to stabilize their mortgage payments by allocating payments in this manner.

278.    More specifically, Plaintiffs requested the right to buydown their escrow account versus financing their escrow contributions by combining escrow payments with their monthly mortgage payments.

279.    This request constituted a receipt for a loan modification or other loss mitigation option.

280.    Defendant failed to respond to Plaintiffs' request for loss mitigation though once annual escrow analyses and/ or escrow buydown.

281.    Defendant further failed to respond to Plaintiffs' repeated requests for information regarding why Defendant was demanding a payment of $4,528.00.

282.    Defendant had the loss mitigation option of properly allocating Plaintiffs' January 2017 mortgage payment made on December 23, 2016.

283.    Defendant failed to inform Plaintiff of this option.

284.    In so doing Defendant violated the Minnesota Homeowners' Bill of Rights.

285.    Defendant further failed to allocate Plaintiff's December 2016 payment in a reasonable manner, and instead allocated the payment in a manner highly likely to cause a deficiency in Plaintiffs' account.

286.    After repeated notices by Plaintiffs that Plaintiffs dispute the amount alleged to be due, Defendant failed to make any attempt to review the information provided by Plaintiffs and, instead, attempted to force Plaintiffs into an unnecessary loan modification on September 2, 2016.

287.    Wells Fargo's call center supervisor Mr. Saavedra declined to reinstate Plaintiffs' lower payments but demanded that Plaintiffs pay their refund balance of $330.05, plus pay Wells Fargo an additional $361.85 for a total of $691.09, in order for Wells Fargo modify their payment to $1,433.95.

288.    This unnecessary modification violates the spirit of Minn. Stat. §582.043.

289.    In so doing, Defendant violated Minn. Stat. §582.043.

290.    Additionally, Plaintiffs offered evidence Wells Fargo acknowledged it initiated a foreclosure proceeding against Plaintiffs.

291.    Wells Fargo's acknowledged multiple times it started a foreclosure proceeding against Plaintiffs in correspondences to Plaintiffs.

Seventh Claim for Relief

Negligent Violations of the Telephone Consumer Protection Act

*47 U.S.C. § 227 Et Seq.*

Against Defendant Wells Fargo

292.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

293.    Plaintiffs are informed and believe, and thereon allege, that Defendant made phone calls

to Plaintiffs' cellular telephones via an "automatic telephone dialing system" (hereinafter

"ATDS") as defined by 47 U.S.C. § 227 (a)(1).

294.    Plaintiffs each are, and at all times mentioned herein were, "person(s)" as defined by 47

U.S.C. § 153 (39).

295.    Defendant is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C.

§ 153 (39).

296.    Plaintiffs' telephone numbers are assigned to a "cellular telephone service" as that term

is used in 47 U.S.C. § 227 (b)(1)(A)(ii).

297.    On information and belief, Wells Fargo utilizes an ATDS to collect alleged debts from

consumers.

298.    Plaintiffs are familiar with ATDS equipment and thereon allege that Wells Fargo called

their personal cell phones with ATDS equipment. Plaintiffs base this belief on the following

facts:

   a.  A pause or delay accompanied many of these calls, whereby a representative was not
       immediately available.
   b.  On several occasions Defendant's auto-dialing system would dial Plaintiffs; when
       Plaintiffs answered these phone calls a representative was entirely unavailable resulting
       in a period of dead air (hereinafter "dead air calls").

299.    Plaintiffs are informed and believe, and allege, that these telephone calls constituted

calls that were not for emergency purposes as defined by 47 U.S.C. § 227 (b)(1)(A)(i).

300.    The calls were made to Plaintiffs' cell phones via ATDS without Plaintiffs' prior express

consent.

301.    Defendant placed or caused to be placed these telephone calls in violation of 47 U.S.C. §

227 (b)(1).

302.    The foregoing acts and omissions of Defendant constitute numerous and multiple

negligent violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

303.    As a result of Defendant's negligent violations of 47 U.S.C. § 227 et seq., Plaintiffs are entitled to an award of $500.00 in statutory damages for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

304.    Plaintiffs are also entitled to seek injunctive relief prohibiting such conduct in the future.

Eighth Claim for Relief

Knowing and/ or Willful Violations of the Telephone Consumer Protection Act

*47 U.S.C. § 227 Et Seq.*

Against Defendant Wells Fargo

305.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

306.    The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/ or willful violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 et seq.

307.    As a result of Defendant's knowing and/ or willful violations of 47 U.S.C. § 227 et seq., Plaintiffs are entitled to treble damages, as provided by statute, up to $1,500.00 for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

Ninth Claim for Relief

Negligent Violations of the Fair Credit Reporting Act

15 U.S.C. §1681, Et Seq.

Against Defendant Wells Fargo

200.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

202.    The foregoing acts and omissions of Defendant Wells Fargo constitute numerous and multiple negligent violations of the FCRA by Defendant Wells Fargo, including, but not limited to, 15 U.S.C. §1681s-2.

203.    Defendant's violations resulted in Defendant furnishing inaccurate information about Plaintiffs.

Tenth Claim for Relief

Knowing and/ or Willful Violations of the Fair Credit Reporting Act

*15 U.S.C. §1681, Et Seq.*

Against Defendant Wells Fargo

193.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

194.    The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the FCRA, including but not limited to failing to conduct a reasonable investigation with respect to the disputed information, and/or failing to review all relevant information before reporting back to the national credit reporting agencies, in violation of 15 U.S.C. § 1681s-2.

195.    Defendant's violations resulted in Defendant furnishing inaccurate information about Plaintiffs.

196.    In December 2016, Wells Fargo inaccurately reported no payment for December 2016 on Plaintiffs' Experian credit report, in violation of the FRCA.

197.    In furtherance of its knowing FCRA violations Wells Fargo again knowingly violated the FCRA by reporting the $330.05 as Plaintiffs' March 2017 mortgage payment on their TransUnion, Equifax and Experian credit reports although Plaintiffs paid their expected required mortgage payment of $1,433.95.

Eleventh Claim for Relief

Intentional Infliction of Emotional Distress

Against Defendant Wells Fargo

198.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

199.    Defendant willfully disregarded the rights of Plaintiffs, namely Plaintiffs' right to be free from harassing, computer-dialed phone calls and Plaintiffs' right to the quiet enjoyment of their home.

200.    Wells Fargo sent Plaintiffs a letter dated May 2, 2017 and admitted it began placing calls to Plaintiffs' cell phone since 2015 and placed two calls per day to Plaintiffs' cells phone from December 2016 to March 2017.

201.    Wells Fargo has knowingly blocked Plaintiffs from their online mortgage account.

202.    Wells Fargo has retaliated against Plaintiffs by preventing and disqualifying Plaintiffs from making any mortgage payment via their online mortgage account.

203.    Wells Fargo sent an independent contractor to trespass and inspect Plaintiffs' property and subjected Plaintiffs to shame, embarrassment and humiliation from their neighbors.

204.    Wells Fargo sent Plaintiffs multiple threatening foreclosure, default and acceleration notices for the purpose of harassing, intimidating and inflicting emotional distress on Plaintiffs.

205.    Plaintiffs sent Wells Fargo multiple correspondences about their medical condition and susceptibilities and vulnerabilities to headaches, depression and stress due to its conduct.

206.    Wells Fargo's action and conducts were knowingly foreseeable that its conduct would cause Plaintiffs extreme emotional distress but Wells Fargo proceeded to act with complete indifference and total disregard to Plaintiffs' emotional health and wellbeing.

207.     Wells Fargo's knowing actions and conducts have resulted in Plaintiffs' severe

emotional distresses and medically diagnosed illnesses continued.

208.    Defendant willfully and without any authority, trespassed on Plaintiffs' property for the purpose of posting a pre-foreclosure notice on Plaintiffs' front door.

209.    Defendant made calls, posted notices, sent statements and letters threatening foreclosure with the express purpose of causing Plaintiffs such emotional distress that Plaintiffs pay Defendant money not due and owing, enter into an unneeded mortgage modification, or allow the bank to take their home.

210.    Defendant thereby acted in an extreme and outrageous manner.

211.    Plaintiffs suffered severe distress from Defendant's actions and statements.

212.    Specifically, Plaintiffs felt and were, in fact, violated and/ or stolen from by Defendant.

213.    Plaintiffs suffered from headaches, shortness of breath, frustration, fear, and anxiety and depression as a direct result of Defendant's intentional behavior and/ or statements.

214.    Mr. Zean has been diagnosed with stress-related medical conditions including, but not limited to, hemicrania continua.

Twelfth Claim for Relief

Invasion of Privacy – Intrusion Upon Seclusion

Against Defendant Wells Fargo

215.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

216.    Defendant repeatedly and continuously called Plaintiffs' cellular telephones to collect an alleged debt that Plaintiffs did not owe.

217.    Defendant continued to place calls to Plaintiffs' cellular telephones after Plaintiffs made repeated requests that Defendant cease its calling.

218.    These calls were a constant, frustrating reminder to Plaintiffs that Defendant was

threatening to take their home without proper authority.

219.    These calls were disruptive to Plaintiffs in that they interfered with Plaintiffs' daily

activities.

220.    Defendant willfully and without authority trespassed onto Plaintiffs' property for the

purpose of posting a pre-foreclosure notice to Plaintiffs' front door.

221.    Wells Fargo sent a separate independent contractor to trespass on Plaintiffs'

property on August 18, 2017.

222.    Defendant placed over 1000 automated calls to Plaintiffs' cell phones and

acknowledged it began placing calls to Plaintiffs' cell phones since 2015.

223.    These calls occurred twice a day every day for period of several months.

224.    Defendant willfully ignored all the warnings and appeals from Mrs. Zean about her

husband's health vulnerability and susceptibility to pain, suffering, and injuries as a result of

Defendant's continuous actions and conducts.

225.    Defendant thereby acted in an extreme and outrageous manner in its intrusion into

Plaintiffs' private life.

226.    Plaintiffs suffered severe distress from Defendant's conduct, actions, and statements.

227.    Specifically, Plaintiffs felt and were, in fact, violated and/ or stolen from by Defendant.

Thirteenth Claim for Relief

Invasion of Privacy – Publication of Private Facts

Against Defendant Wells Fargo

228.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as

though fully stated herein.

229.    Defendant distributed untrue messages that Plaintiffs were delinquent in paying their

mortgage and were in default.

230.    Defendant distributed an untrue message that Plaintiffs had defaulted on their mortgage.

231.    Defendant distributed this message over the bank's computer system in a manner that persons and employees with no reasonable need to know the information were notified of Plaintiffs' private financial details.

232.    The above promises and statements by Defendant are an admission by Defendant that it owed certain duties to its customers to protect customers' private information from any unauthorized access or disclosure.

233.    Many persons have heard about Wells Fargo's publicity of Plaintiffs' private matter which has certainly become one of public knowledge.

**The Meeting with a Wells Fargo Banker**

234.    It is undisputed that Wells Fargo made unauthorized disclosures of false information to its business banker Ms. Brianna Koch, other Wells Fargo employees and the branch office manager Mr. Mark Nyemah in June of 2017, all who did not have a need to know.

235.    On June 28, 2017, Mr. Zean, who is the treasurer of his church, met with a Wells Fargo banker Ms. Brianna Koch regarding the church's bank account.

236.    When the banker pulled up the church's account, a message displayed on the banker's computer screen that indicated Plaintiffs' mortgage was in default.

237.    The computer screen was "highly visible" and Mr. Zean was very embarrassed by the display of "false, private information," alleging Plaintiffs were many days late on their June 2017 mortgage payment and the loan was in default.

238.    The display was seen by a Wells Fargo's employee, Brianna Koch and other branch employees in the branch office that day, including the branch manager Mr. Mark Nyemah.

239.    Wells Fargo later wrote Plaintiffs and acknowledged its wrongful, false and defamatory disclosure and admitted it did not live up to its commitment in that instance.

**Wells Fargo Trespassed Plaintiffs' Property in July 2017 to Serve a Foreclosure Notice**

240.    Wells Fargo sent a man who trespassed on Plaintiffs' property in July 2017 and put a very large and visible and recognizable foreclosure-type notice on Plaintiffs' front door hander where all their neighbors could see and associate the notice with a mortgage delinquency.

241.    The notice included a demand for borrower to call lender immediately.

242.    The notice was humiliating and embarrassing for Mrs. Zean's mother, the neighbors and visitors to see although Plaintiffs were not in default and yet were harassed like that.

**Wells Fargo's Illegal Inspector, Trespassed on Plaintiffs' Property**

243.    On Friday, August 18, 2017, Wells Fargo again sent another person named Mohamad who trespassed on Plaintiffs' property and began taking pictures of their house to do a "drive-by inspection" of their house.

244.    Mohamad showed Mr. Zean a message that shows he was contracted by Wells Fargo Home Mortgage. Wells Fargo gave Mohamad specific instruction to ask Plaintiffs' neighbors questions and Plaintiffs' were so humiliated and embarrassed.

**Wells Fargo's Disclosures of Private Matter on Plaintiffs' Church Account Page**

245.    On multiple other occasions, Wells Fargo intentionally and consistently displayed defamatory private information on Plaintiffs' unrelated Church business account page where all could see a display that says: "Your account is 56 days past due and your account is in default."

246.    Wells Fargo intentional disclosure of "publicity" to Plaintiffs' private matter was intentional and other could saw the disclosure which was displayed with the intent to embarrass, humiliate and harass Plaintiffs and did harmed Plaintiffs.

**Wells Fargo's Disclosures of Plaintiffs' Private Matter to its Minnesota Tellers**

247.    Wells Fargo has unfairly, unjustly and intentionally given undue "publicity to

Plaintiffs' private matter by disclosing that Plaintiffs are in default and past due continuously.

248.    Wells Fargo made habitual disclosures to its local branch tellers who repeatedly told Plaintiffs that their mortgage account was in default and past due.

249.    The tellers as a matter of practice, repeatedly asked Plaintiffs to pay their past due mortgage balances each month at different branch locations in the twin cities when Plaintiffs attempted to make their mortgage payment with the tellers at Wells Fargo's branches.

250.    Customers on the line in the bank or in Plaintiffs' car at the drive through would overhear the tellers asking Plaintiffs to pay their past due or default balances each month.

251.    Plaintiffs have had to endure and experience this embarrassment and humiliation from Wells Fargo for about 19 months now at Wells Fargo's branches when making payments.

## Wells Fargo's Intentional Blocking of Plaintiffs Mortgage Account and Denial for Plaintiffs to make Online Payments

252.    Wells Fargo has repeatedly and routinely blocked Plaintiffs from accessing their online account with the intent to compel Plaintiffs to face the embarrassment at its local branches.

253.    Additionally, Wells Fargo has blocked Plaintiffs from making any online payment and asserts, Plaintiffs are in default and are unqualified to make online payments.

254.    Plaintiffs are compelled to face the embarrassment and humiliation at Wells Fargo's local branch offices to make their monthly payments.

255.    Defendant's reckless disclosure of Plaintiffs' private matter, are in grossly violation of all its policies, codes of conduct, and promises as outlined in its Code of Ethics and Business Conduct in regards to its customers that resulted in injury to Plaintiffs' reputation and health.

256.    Mr. Zean has repeatedly experienced a panic attack, suffered anxiety and headaches, and had to see his doctor multiple times.

257.    Mr. Zean continued to suffer from panic attacks, anxiety, and constant headaches.

258.    Defendant' disclosure cast a stigma upon Plaintiffs and resulted in shame, disgrace, dishonor, embarrassment, and humiliation because the disclosure by virtue of its falsehood and malicious implications depicted Plaintiffs as good-for-nothing, unreliable, untrustworthy, and undependable.

Fourteenth Claim for Relief

Defamation

Against Defendant Wells Fargo

259.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

260.    On Thursday, June 28, 2017, Defendant disclosed to at least one third party that Plaintiffs were 58 days delinquent on their May 2017 mortgage payment.

261.    Specifically, Defendant negligently disclosed these and other untrue statements to at least one employee with no legitimate interest or need to know the information.

262.    Defendant's employee in return disclosed the defamatory statements to the branch manager, which accounts for a second publication of the disclosure.

263.    Plaintiffs are especially upset and disappointed that Defendant's branch manager saw the disclosure because the manager is also a Liberian immigrant and as such is a member of the very small Twin Cities Liberian community; hence, the disclosure is bound to spread in their community and further embarrass and humiliate Plaintiffs.

264.    Defendant also disclosed to at least one additional third party that Plaintiffs were in default on their loan.

265.    This fact was untrue as Plaintiffs paid their May 2017 mortgage payment of $1,496.85 on May 5, 2017.

266.    The statement was published with malice as evidenced by Defendant's violation of its

own confidentiality and nondisclosure policies and its pattern of harassment, intimidation, and bullying of Plaintiffs.

267.    Defendant's false statements were made knowingly or with reckless disregard for their truthfulness or falsity.

268.    Defendant knew the statements were false as Defendant had no reasonable basis for believing them to be true.

269.    Defendant's statement regarding Mr. Zean's alleged failure to manage his money also paints Mr. Zean's Church in a negative manner.

270.    Defendant was reckless if not intentional in not foreseeing or anticipating such scenarios as that which Mr. Zean experienced and was greatly embarrassed and humiliated.

271.    Prior to Defendant's disclosure of false information about Plaintiffs, Defendant's employee greatly respected Mr. Zean and knew only little about Mr. Zean, which was limited to the fact that Mr. Zean was a treasurer and business customer of his Church account and was affiliated with his Church as a religious person.

272.    Defendant has repeatedly, undeservedly, and unjustifiably harassed and intimidated Plaintiffs by repeatedly displaying similar false statements on Plaintiffs' online account login page time and again.

Fifteenth Claim for Relief

Compelled Self Publication Defamation

Against Defendant Wells Fargo

273.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

274.    In Lewis v. Equitable Life Assurance Soc'y, 389 N.W.2d 876, 888 (Minn. 1986), the Minnesota Supreme Court recognized the theory of compelled self-publication.

275.    Mr. Zean was compelled to repeat a self-publication of the defamation to Defendant's employee via email communication about the disclosure and the embarrassment and humiliation the disclosure caused him.

276.    Defendant's branch manager called Mr. Zean on Friday, July 7, 2017, to ask Mr. Zean about the incident. Under the circumstances, Mr. Zean was again compelled reiterate the false to information to Defendant's branch manager before correcting it.

Sixteenth Claim for Relief

Knowing and/ or Willful Violations of the Fair Credit Reporting Act

*15 U.S.C. §1681, Et Seq.*

Against Defendant Wells Fargo

277.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

278.    The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the FCRA, including but not limited to failing to conduct a reasonable investigation with respect to the disputed information, and/or failing to review all relevant information before reporting back to the national credit reporting agencies, in violation of 15 U.S.C. § 1681s-2.

279.    Defendant's violations resulted in Defendant furnishing inaccurate information about Plaintiffs.

280.    On July 9, 2018, Wells Fargo wrongfully reported Mr. and Mrs. Zean as being 30-59 days later on their June 2018 and/or July 2018 mortgage payments.

281.    Wells Fargo reported Plaintiffs 30 days late on all their credit reports with all three credit reporting agencies, TransUnion, Equifax, and Experian.

282.    As a result, Mrs. Zean credit score dropped about 67 points and Mr. Zean credit score

dropped about 96 points as well.

283.    Wells Fargo's conduct has been so hard on Plaintiffs, especially Mr. Zean and, subsequently, led to his nervous and mental breakdown stemming from intense mental distress including depression, anxiety and acute stress disorder which has greatly devastated Plaintiffs.

284.    Mr. Zean suffered continuous medical conditions due to stress resulting from Wells Fargo's conduct and actions.

285.    Mr. Zean was again recently seen for headaches, anxiety and sleeplessness as a result.

286.    Mr. Zean was also recently referred to a Cardiologist for his medical condition and put on prescription medication for anxieties, stress, depression and insomnia—all due to Wells Fargo's willful and repeated conducts as a direct result of Wells Fargo's conduct.

287.    Wells Fargo wrongfully reported Mr. and Mrs. to the credit reporting agencies on July 9, 2018 and alleged that Plaintiffs were 30 to 59 days a past due and owed a debt in the amount of $3,043.99 which included a late charge of $37.45.

288.    Wells Fargo demands, Plaintiffs must make their loan current by paying two mortgage payments in the amount of $3,043.99.

289.    Defendant asserts on Plaintiffs' credit report, "Dispute resolved; customer disagrees."

290.    Wells Fargo committed this act despite its knowledge that there is an ongoing litigation and the debt dispute is not resolved and is currently being disputed in Federal Court.

291.    As a result, Plaintiffs were repeatedly denied consumers credits then and now.

292.    Plaintiffs disputed the wrongful reporting with Wells Fargo and the Credit reporting agencies but Wells Fargo failed to correct the inaccuracy but asserts it's accurately and correctly reported although Plaintiffs paid their June 2018 and July 2018 mortgage payments.

Seventeenth Claim for Relief

Negligent Violations of the Fair Credit Reporting Act

15 U.S.C. §1681, Et Seq.

Against Defendant Wells Fargo

293.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

294.    The foregoing acts and omissions of Defendant Wells Fargo constitute numerous and multiple negligent violations of the FCRA by Defendant Wells Fargo, including, but not limited to, 15 U.S.C. §1681s-2.

295.    Defendant's violations resulted in its furnishing of inaccurate data about Plaintiffs.

Eighteenth Claim for Relief

Knowing and/ or Willful Violations of the Fair Credit Reporting Act

*15 U.S.C. §1681, Et Seq.*

Against Defendant Wells Fargo

296.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

297.    It has now become quite apparent that Wells Fargo intends to continue its conduct to intentionally inflict emotional distress upon Plaintiffs.

298.    Wells thereafter falsely reported it did not receive Plaintiffs' payment to TransUnion, Experian and Equifax.

299.    After Wells Fargo received Plaintiffs required monthly September 8, 2018 mortgage payment of $1,630.63, Wells Fargo knowingly sent Plaintiffs' payment into an unapplied account on September 8, 2018 in breach of the mortgage contract and note.

300.    Wells Fargo misleadingly and fraudulently reported it received a lesser payment of $1,503.27 from Plaintiffs on September 8, 2018.

301.    Wells Fargo made this false representation on Plaintiffs' Account Summary and on Plaintiffs' mortgage statement.

302.    But Plaintiffs made a single required monthly payment of $1, 630.63 on September 8, 2018.

303.    However, Wells Fargo fraudulently, intentionally and in bad faith, subtracted $127.36 from the payment and recorded it as a separate fund.

304.    Wells Fargo then sent the $127.36 into an unapplied fund account for the purpose of causing deficiency in Plaintiffs' September 2018 payment.

305.    Wells Fargo's intent was to cause a default in Plaintiffs' September 2018 payment for the purpose of charging them a late charge of $37.45 for allegedly not receiving their required full monthly payment of $1,630.63 before September 15, 2018.

306.    Wells Fargo recorded and reported that Plaintiffs paid an alleged partial payment of $1,503.

307.    Sure enough, Wells Fargo later charged Plaintiffs a late charge of $37.45 on September 17, 2018 for allegedly paying a partial payment.

308.    But Plaintiffs paid their single required monthly payment of $1,630.63 on September 8, 2018 and were given a confirmation receipt.

309.    Plaintiffs disputed Wells Fargo refused to correct its inaccurate reporting with TransUnion, Equifax and Experian but indicated on Plaintiffs' credit reports, "disputed investigated consumers disagree."

310.    The foregoing acts and omissions of Defendant Wells Fargo constitute numerous and multiple negligent violations of the FCRA by Defendant Wells Fargo, including, but not limited to, 15 U.S.C. §1681s-2.

311.    Defendant's violations resulted in its furnishing of inaccurate data about Plaintiffs.

Nineteenth Claim for Relief

RESPA Section 2605(e)(1)(B) (1)(2) Qualified Written Request (QWR)

Against Defendant Wells Fargo

312.    Plaintiffs incorporate by reference all of the above paragraphs of this Complaint as though fully stated herein.

313.    On July 13, 2016, Plaintiffs sent Wells Fargo Home Mortgage an important communication seeking answers under RESPA Section 2605(e)(1)(B) (1)(2) Qualified Written Request (QWR) for Wells Fargo's answer regarding its past due and inaccurate reporting in the amount of $3006.54, plus a late fee of $37.45 for a combined total balance of $$3,043.99.

314.    Plaintiffs asked Wells Fargo why it reported them late or past due on their credit reports.

315.    Wells Fargo was required to provide a timely response within 30 days under RESPA requirement but responded in an untimely manner which was not until after 34 days in violation of RESPA Section 2605(e)(1)(B) (1)(2) and other related sections.

316.    Due to Wells Fargo untimely response, Plaintiffs solicited legal consultation online and posted a legal bid seeking legal advice on a possible course of action to take against Wells Fargo in reporting them past due and 30-59 days late to all three credit reporting agencies.

317.    Plaintiffs incurred out of pocket expenses and were charged a total of $150.00 for legal consultation regarding Wells Fargo's RESPA and FCRA violations.

## Jury Demand

318.    Plaintiffs hereby demands a trial by jury.

## Prayer for Relief

WHEREFORE, Plaintiffs, by and through their attorney, respectfully pray for Judgment to be entered in favor of Plaintiffs and against Defendant as follows:

> a.    Declaratory Judgment that Plaintiffs do not owe Defendant any past due payment or money nor owe Defendant's any late fees;
>
> b.    An order compelling Defendant Wells Fargo to remove all funds from the

48

suspect account and apply such monies pursuant to the mortgage contract;

c.    Statutory damages;

d.    Actual damages;

e.    Restitution;

f.    Punitive damages;

g.    Injunctive relief prohibiting such conduct in the future;

h.    Reasonable attorney's fees, litigation expenses, and cost of suit; and

i.    Any other relief deemed appropriate by this Honorable Court.


Dated: September 4, 2018            Respectfully Submitted,

s/ SamuelZean
Samuel Zean Pro Se Plaintiff
Eunice Zean Pro Se Plaintiff
8708 62ND Ave. North
Brooklyn Park, MN 55428
(651) 528-1594
samuelzean@hotmail.com